# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3583

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri |
| Willie E. Boyd, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 11, 1999
Filed: June 21, 1999

_____

Before LOKEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
WATERS,[1] District Judge.

_____

WATERS, District Judge.

Willie E. Boyd appeals his conviction, after a bench trial, on eight counts of a
ten count indictment against him. Boyd contends that the district court[2] erred when it:
(1) denied his motions to suppress evidence seized at the time of his arrest and certain

_____

[1]The Honorable H. Franklin Waters, United States District Judge for the Western
District of Arkansas, sitting by designation.

[2]The Honorable Stephen N. Limbaugh, United States District Judge for the
Eastern District of Missouri.

statements he made after being taken into custody; (2) concluded there was sufficient evidence to convict him of being a felon in possession of guns, of possession of cocaine with the intent to distribute the controlled substance, and of having caused the filing of false currency transaction reports; and (3) improperly allowed joinder of non-related offenses. Finally, Boyd argues he is entitled to reversal of his conviction based on prosecutorial misconduct before and during the trial. For the reasons stated below, we affirm.

## I. FACTS

After having received information from a confidential informant (CI) that cocaine was being sold in the lobby area of Cole's Motor Lodge in St. Louis, Missouri, Bobby Garrett, a detective with the St. Louis Metropolitan Police Department, conducted a surveillance of the motel on November 6, 1995. After observing seven individuals go to a black door on the west side of the lobby of the motel, knock on the door, and exchange with a black male an undetermined amount of money for an unknown object, Garrett and other officers knocked on the door. The door was opened by a male, the appellant, who later identified himself as Billy Jackson.

Garrett saw through the partially open door a double barreled shotgun in the background and attempted to fully open the door. Jackson a/k/a Boyd slammed the door shut, and Garrett heard footsteps and a thud. When the officers opened the door, Garrett saw a Ruger .357 Magnum handgun on the floor only inches from appellant's feet and a plastic cellophane bag containing a substance which was later determined to be cocaine base. Other weapons were found near where Boyd was standing. At about the same time, Garrett also heard running footsteps and the flushing of a toilet. Garrett then observed an individual, later identified as Larry Hassell, exiting the bathroom.

Appellant was taken into custody and as they left the motel, he locked the front door with a set of keys he had on his person. While at the station, Boyd told Garrett he kept a firearm on his person for protection. Boyd produced a Missouri driver's license in the name of Billy Jackson and was booked under that name.

On July 7, 1995, August 5, 1995, and September 16, 1995, the Casino Queen, a gambling boat that navigates the Mississippi River, filed three currency transaction reports (CTRs) with the Internal Revenue Service (IRS) on behalf of Billy Jackson. A CTR must be filed when there is a cash transaction of $10,000 or more. The original CTR is sent to the IRS and a copy with an attached surveillance photograph of the customer is maintained by the Casino Queen. The Casino Queen also had a photocopy of Billy Jackson's Missouri driver's license that it maintained in its records after the filing of the first CTR on Jackson.

According to logs maintained by the Casino Queen, from March of 1995 through December of 1995, Jackson purchased $148,483.00 in chips, with a cash out of $94,830.00 during this period, for a net loss of $53,653.00 Greg Fisher, an assistant shift manager for the Casino Queen, was familiar with Jackson and identified him as the appellant, Boyd. Fisher filled out the first CTR on Jackson and obtained a copy of his driver's license during the process.

In March of 1996, the United States Marshal for the Eastern District of Missouri received a United States Parole Commission violator's arrest warrant for Boyd who was on parole from an 18 year sentence for possession with intent to distribute cocaine and possession of an unregistered machine gun. Deputy Marshal Luke Adler's investigation revealed that Boyd was living at 2091 Victory Way Lane, which was a home leased by Sharon Troupe, Boyd's girlfriend. On February 1, 1997, Adler received a phone call from a CI informing him that Boyd was at the residence with Troupe. Deputy Adler, Deputy Jeff Graue, and two members of the St. Louis Metropolitan Police Department,

Brian McKee and Joseph Kuster,[3] who were deputized as Special Deputy United States Marshals, went to Troupe's house to arrest Boyd.

Adler and Graue went to the front door while McKee and Kuster positioned themselves near the rear door of the home. Adler and Graue knocked, identified themselves as police, and asked Troupe to open the door. Troupe opened the door and the marshals observed Boyd's son, Muhammad Matteen,[4] nearby. The marshals informed Troupe that they had a warrant for Boyd's arrest and asked where he was. Troupe responded by pointing upstairs and stating, "He's up in his room."

Troupe and Matteen were told to get down on the floor. Graue and Alder then went up the stairs. After Graue ordered him to come out, Boyd came out of the master bedroom with his hands raised wearing only a pair of sweat pants. While Graue handcuffed Boyd, Adler "covered" Boyd and at the same time kept an eye on Troupe and Matteen. Graue then brought Boyd downstairs. Adler went into the bedroom and briefly glanced around to make sure no one else was located in the bedroom. He looked on the side of the bed and into an open closet but did not take time to look under the bed. Adler observed an open black bag on the floor of the closet with one plate of a triple beam scale protruding from it.

Adler went downstairs and handcuffed Troupe and Matteen to each other and had them sit on the sofa. Meanwhile McKee and Kuster entered the residence. They were informed the residence had not been secured. McKee performed a "protective sweep" of the lower level while Kuster performed a "protective sweep" of the upper level. Kuster entered the master bedroom and looked under the bed. He then looked in the open closet and saw a gun handle protruding from a towel. Next to the weapon,

---

[3]Kuster's name is spelled in various ways throughout the record.

[4]Matteen's name is spelled in various ways throughout the record.

–4–

he observed an open black bag with a scale, some currency, and a clear plastic bag with white powder in it. Kuster placed the gun and the black bag on the bed.

Meanwhile, Adler advised Boyd, Troupe, and Matteen, of their <u>Miranda</u> rights. Alder then took Troupe into the kitchen and asked her permission to search the residence. Troupe signed a consent to search.

The closet in the master bedroom contained only men's clothing. At Boyd's direction, the marshals retrieved clothing and shoes from the closet and socks from a dresser in the bedroom for the defendant. Adler and Graue then transported Boyd to jail. On the way to the jail, Adler talked to Boyd about the gun asking whether he had the gun to use against law enforcement officers. Boyd responded indicating he had the gun for protection. When Adler examined the contents of the black bag at the marshal's office, he found forms of identification bearing the names Billy Jackson, Michael Francis Young, and Willie Boyd. The forms of identification contained different Social Security Numbers for each identity but all contained Boyd's picture. Adler also found keys that were later determined to fit the doors of an address Boyd had listed on his YMCA card and a business he owned and worked at.

On August 7, 1997, a grand jury sitting for the Eastern District of Missouri returned a four-count indictment. Boyd filed a motion to suppress evidence and statements and a motion to dismiss the indictment on September 2, 1997. A hearing was held before the Magistrate Judge[5] on October 6, 1997. A report and recommendation was filed on October 22, 1997, recommending that Boyd's motions be denied.

---

[5]The Honorable Mary Ann Medler, United States Magistrate Judge for the Eastern District of Missouri.

A ten count superseding indictment was filed on December 4, 1997. Count one of the indictment charged Boyd with possession with intent to distribute cocaine. 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Counts two and eight charged Boyd with being a felon in possession of a firearm. 18 U.S.C. §§ 922(g) and 924 (c). Counts three and four charged Boyd with using false Social Security Numbers. 42 U.S.C. § 408 (a)(7). Counts five, six, and seven charged Boyd with causing the filing of false currency transaction reports. 31 U.S.C. §§ 5313, 5324 (a)(2) and 5324(C) and Title 31, Code of Federal Regulations, § 103.11. During the trial, count nine of the indictment was dismissed upon motion of the government. Count ten of the indictment was an asset forfeiture count in which forfeiture of the monies involved in the violations of counts five, six, and seven was sought . 18 U.S.C. § 982(a)(1).

On January 14, 1997, Boyd filed another motion to suppress and dismiss the indictment. On January 30, and February 13, 1998, the Magistrate Judge held additional hearings. On March 30, 1998, the Magistrate Judge filed her report recommending that Boyd's motion to suppress evidence and dismiss the indictment be denied. On April 10, 1998, the district court adopted the Magistrate Judge's reports and recommendations. On the same day, Boyd waived his right to a trial by jury.

On April 13, 1998, Boyd's bench trial began and on April 16, 1998, the court returned verdicts of guilty on counts one through eight of the superceding indictment. Boyd appeared for sentencing on October 1 and 2, 1998. The court imposed a sentence of 276 months with a term of supervised release of six years. This appeal followed.

## II. DISCUSSION

## A. The Weapon, Narcotics, and Forms of Identification

Boyd first asserts that the district court erred in denying his motions to suppress evidence obtained during an unconstitutional search. Boyd contends the weapon, narcotics, and forms of identification found by the marshals when they conducted their "protective sweep," should have been suppressed because the marshals actually conducted an illegal search. Specifically, Boyd asserts that: (1) the marshals had no reasonable suspicion that there were persons in the house, other than the ones that were in plain sight, i.e., Boyd, Troupe and Matteen, and, thus, the marshals had no reason to conduct a "protective sweep;" (2) even if the marshals were entitled to a protective sweep, the sweep that they conducted was more than cursory; (3) even when the marshals saw the gun handle sticking out of a towel in the closet, they could not look inside the towel because there was no reasonable suspicion that a person could be inside the towel, and, further, because everyone else was downstairs, the gun did not pose a danger to the officers; and (4) the marshals had no basis to look inside the black bag because there was no reasonable suspicion that a person could be hiding in it. Boyd further asserts that once he had been arrested and taken downstairs the purpose of the officers being at Troupe's house was completed and the officers should have left the house without ever going back upstairs.

We review facts supporting the denial of a motion to suppress evidence for clear error and review the legal conclusions based on those facts de novo. See United States v. Beatty, 170 F.3d 811 (8th Cir. 1999). Under Maryland v. Buie, 494 U.S. 325, 337 (1990), a "protective sweep" is justified in connection with an in-home arrest if an officer reasonably believes that the area to be swept harbors an individual posing a danger to those at the arrest scene. United States v. Cunningham, 133 F.3d 1070, 1073 (8th Cir.), cert. denied, 118 S. Ct. 1823 (1998). "The officer's belief must be based on specific and articuable facts." Id.

At the time of Boyd's arrest, the marshals knew Boyd was on parole for possession of narcotics with intent to distribute and possession of a machine gun. The marshals looked around the bedroom twice. First, Adler quickly glanced around the room before the officers took Boyd, who by then was handcuffed, downstairs. However, Adler's primary attention was divided between keeping an eye on the two individuals downstairs on the floor and covering Graue. Adler did not take time to look in all the places large enough to conceal a person. Second, Kuster looked around the master bedroom, under the bed, and looked into the closet. Clearly a sweep of this room was reasonable as Boyd was arrested as he came out of this room and a cursory visual inspection of the closet was appropriate as a person might have been hiding there. Buie, 494 U.S. at 327.

The fact that Boyd had already been handcuffed and taken to the downstairs area, and Adler had briefly glanced around the room before Kuster performed his visual inspection of the bedroom and closet, does not invalidate the protective sweep. See Buie, 494 U.S. at 334 (Officers are permitted to take steps to ensure their safety both "after, and while making the arrest."). See also United States v. Lucas, 898 F.2d 606 (8th Cir. 1990)(While it is possible for a search incident to an arrest to be "undertaken too long after the arrest and too far from the arrestee's person . . . it does not make sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures."). "When the law enforcement officers entered the house . . . they had no way of knowing how many people were there." United States v. Horne, 4 F.3d 579, 586 (8th Cir. 1993). The search was "quick and limited," Buie, 494 U.S. at 336, and initially confined to places large enough to conceal a person. We conclude the protective sweep was proper.

With respect to the black bag, Adler saw a scale he associated with illegal drug use protruding from it. When Kuster looked into the closet, he saw the handle of a gun. Next to the weapon, he observed an open black bag with a scale, some currency, and a clear plastic bag with white powder in it. Because the physical evidence was

discovered in plain view during the course of a valid protective sweep, it was admissible at trial. See Buie, 494 U.S. at 330. See also United States v. Evans, 966 F.2d 398, 400 (8th Cir. 1992)(holding the plain view doctrine permits seizure of items if police are lawfully in position to observe item and if its incriminating character is immediately apparent).

Further, even if we concluded the protective sweep was invalid, the physical evidence would have inevitably been discovered during the search of the house after Troupe's consent was obtained. Under the inevitable discovery doctrine:

> [i]llegally seized evidence may be admitted if the Government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."

United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998)(quoting United States v. Conner, 127 F.3d 663, 667 (8th Cir.1997)). See Nix v. Williams, 467 U.S. 431, 444 & 448 (1984). Here, the Government met its burden of proof on both parts of this test. See Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1244 (8th Cir. 1995)(We may affirm the judgment of the district court on any ground supported by the record.).

## B. The Statements

Boyd next argues the district court erred in admitting the statement he made to Adler regarding the gun. This statement was made after Boyd had been arrested and was being transported to jail.

Adler initiated the conversation by telling Boyd that he "had a nice gun." Adler then asked Boyd if the gun was kept "in case of police." Boyd answered that the gun was kept for protection against criminal acts. Boyd asserts that the statement he made while being transported to the jail should have been held inadmissible because it was made during an "interrogation." Although he had been given his Miranda warnings at the house, Boyd states nearly two hours had passed and the warnings should have been repeated before Adler started questioning him. Miranda v. Arizona, 384 U. S. 436 (1966). Boyd asserts that at trial, Adler admitted that when he made his comments to Boyd concerning the gun, he was "directly interrogating him." The statement was used against Boyd in convicting him of being in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

In this case the district court concluded (1) Boyd understood and voluntarily waived his rights, and (2) the statement was not the result of interrogation. We review the facts supporting the district court's denial of a motion to suppress for clear error, and review de novo the legal conclusions that are based upon those facts. See United States v. Sykes, 144 F.3d 564, 566 (8th Cir. 1998).

"The Miranda protections are triggered only when a defendant is both in custody and being interrogated." United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995). The Supreme Court defines interrogation as "'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response. . . .'" Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). Not all statements made while in custody, however, are products of interrogation. See Hatten, 68 F.3d at 262. In Hatten we said that "[a] voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings." Id. (citing Innis, 446 U.S. at 299).

We agree with Boyd that the statement was the product of custodial interrogation. However, this fact alone does not render the statement inadmissible.

–10–

The district court also found that Boyd had waived his <u>Miranda</u> rights. "The determination of whether an accused has knowingly and voluntarily waived his <u>Miranda</u> rights depends on all the facts of each particular case." <u>Stumes v. Solem</u>, 752 F.2d 317, 320 (8th Cir. 1985). The circumstances include "the background, experience, and conduct of the accused." <u>Id</u>. The government has the burden of proving that the defendant "voluntarily and knowingly" waived his rights. <u>Id</u>.

One of the cases relied on by Boyd is <u>United States v. Cody</u>, 114 F.3d 772, 775 (8th Cir. 1997), in which we stated that "[o]nce a person in custody has invoked her right to remain silent, admissibility of any of her subsequent statements depends on whether her 'right to cut off questioning' was 'scrupulously honored.'" In this case, however, Boyd does not allege that he ever explicitly invoked his right to remain silent or asked for an attorney, prior to making the incriminating statements. Boyd does not dispute that he was advised of his <u>Miranda</u> rights, nor does he deny that he understood those rights. Instead, he merely relies on the existence of a one and one-half or two hour delay between his having been given his rights and Adler's questioning. This is insufficient. Adler was not required to readvise Boyd of his <u>Miranda</u> rights under these circumstances and the district court properly admitted the statements.

## C. The Entry to Troupe's Home

For his third point, Boyd argues the district court erred in concluding he was a resident of 2091 Victory Way Lane and it was therefore proper for the marshals to enter Troupe's home to arrest him. In <u>Payton v. New York</u>, 445 U.S. 573 (1980), the Supreme Court held that police officers do not need a search warrant to enter the home of the subject of an arrest warrant in order to effectuate the arrest. The Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." <u>Id.</u>, at 603. However, in <u>Steagald v. United States</u>, 451 U.S. 204, 215-16 (1981), the Supreme Court held that

–11–

a search warrant must be obtained, absent exigent circumstances or consent, before a police officer can enter a third party's home to search for the subject of an arrest warrant.

"[I]f the suspect is a co-resident of the third-party, then <u>Steagald</u> does not apply, and <u>Payton</u> allows both arrest of the subject of the arrest warrant and use of evidence found against the third party." <u>United States v. Risse</u>, 83 F.3d 212, 216 (8th Cir. 1996) (citations and internal quotation marks omitted). Thus under <u>Payton</u>, "officers executing an arrest warrant [at a third person's home] must have a '<u>reasonable belief</u> that the suspect resides at the place to be entered . . . and [have] reason to believe that the suspect is present' at the time the warrant is executed." <u>Risse</u>, 83 F.3d at 216. "Whether the police officers possessed a reasonable belief that [Boyd] resided [at 2091 Victory Way Lane] 'is a mixed question of fact and law. The findings with respect to the historical facts are reviewed under the clearly erroneous standard; the ultimate conclusion, however, is subject to <u>de novo</u> review." <u>Risse</u>, 83 F.3d at 215 (citations omitted).

Here the evidence supports the marshals' belief that Boyd resided at 2091 Victory Way Lane. They had received information to that effect from a CI. This information was corroborated by interviewing residents in the neighborhood. The evening the warrant was executed, the CI told Adler he had seen Boyd arrive at the residence and that Troupe had just arrived at the home. When the marshals arrived at the home, the hood of Troupe's black Volvo was still warm which confirmed the CI's statement that Troupe had just arrived. In addition, the marshals knew Troupe was Boyd's girlfriend and a car matching the description of the one driven by Boyd was parked outside the residence. We therefore conclude the marshals could lawfully enter the residence with only an arrest warrant. <u>See</u> <u>Risse</u>, 83 F.3d at 217.

Further, when the marshals knocked on the door and told Troupe they had a warrant for Boyd, Troupe looked upstairs, pointed and said, "He's up in his room." It

was therefore reasonable for the marshals to believe they had Troupe's consent to enter the home.

## D.  Felon in Possession Charges

With respect to count two of the superceding indictment, which charges that Boyd was in possession of a firearm on February 1, 1997, the day of his arrest at 2091 Victory Way Lane, Boyd asserts that the only evidence  the government offered was the fact that he was in the same house in which the gun was found.  Boyd contends that he was not in control of the area in which the weapon was found and there was no physical evidence linking him to the gun.

Section 922(g)(1) makes it unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition;  or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(1).  To convict someone under § 922(g)(1), the government must prove, beyond a reasonable doubt, that: (1) the defendant had previously been convicted of a crime that was punishable by a term of imprisonment exceeding one year;  (2) the defendant knowingly possessed a firearm;  and (3) the firearm has been in or has affected interstate commerce.  United States v. Horsman, 114 F.3d 822, 824 (8th Cir. 1997), cert. denied, 118 S. Ct. 702 (1998).

The first and third elements are undisputed.  Boyd's sole argument is that he did not knowingly possess a firearm.  When a defendant argues that the evidence introduced at trial was insufficient to sustain a conviction, we view the evidence presented in the light most favorable to the government, and uphold the verdict if there is substantial evidence to support it.  United States v. Schubel, 912 F.2d 952, 955 (8th

Cir. 1990). The standard to be applied in determining the sufficiency of the evidence is a strict one, and the finding of guilt should not be overturned lightly. Id.

A conviction for violating § 922(g) may be based on constructive or joint possession of the firearm. United States v. Boykin, 986 F.2d 270, 274 (8th Cir. 1993). "Constructive possession of the firearm is established if the person has dominion over the premises where the firearm is located, or control, ownership, or dominion over the firearm itself." Id. Moreover, "[c]onstructive possession can be established by a showing that the firearm was seized at the defendant's residence." Id.

We hold there was ample evidence to support the district court's finding that Boyd had constructive possession of the gun. Boyd was in close proximity to the firearm at the time of his arrest, there was evidence Boyd was living at Troupe's house, including Troupe's reference to the bedroom as Boyd's room, and the closet in which the weapon was found contained his clothes and his identification. Additionally, Adler testified that Boyd admitted that the gun was his after he was arrested (the statement Boyd asked the court to suppress, infra, based on the lack of Miranda warnings).

With respect to count eight of the superceding indictment, which charges that Boyd was in possession of a firearm on November 6, 1995, Boyd also asserts that there was no evidence, other than his mere proximity to the weapon, that showed he was in possession of the firearm. Boyd points out there was testimony at trial that he merely worked at the motel and that the motel's owner kept several firearms in the office. He further argues the evidence as easily pointed to the gun being the property of the person or persons heard running away from the room after the marshals knocked as it did to the gun being his. Relying on United States v. Johnson, 18 F.3d 641, 647 (8th Cir. 1994), Boyd argues proximity to the weapon is simply insufficient to establish that he was in possession of the gun. In short, Boyd's contention is that he merely had the misfortune of standing in the vicinity of the gun when the marshals gained entrance to the room.

We believe the district court correctly found Boyd had "constructive possession" of the gun. Garrett, the officer involved in the incident, testified that before he entered, he heard a thud, which he knew was a gun. Garrett further testified that when he opened the door, the gun was just inches away from Boyd's feet. Finally, Garrett testified that on the way to the police station Boyd indicated he kept a firearm on his person for protection. The district court found Garrett to be a credible witness. We will not disturb this finding. See United States v. Heath, 58 F.3d 1271, 1275 (8th Cir. 1995)(The district court's determination of credibility of witness is virtually unreviewable on appeal.).

### E. Possession with Intent to Distribute Cocaine

Boyd asserts that the evidence was insufficient to show that he possessed, either "actually or constructively"' the cocaine that was found at Troupe's house. Specifically, Boyd contends that the evidence was insufficient to establish "constructive possession" because "mere physical proximity" to the cocaine is not enough to support a conviction for possession. Boyd further contends that even if the court finds possession, there was not enough evidence to prove intent to distribute. Boyd asserts that the government found 33.72 grams, which is a small amount of cocaine and one could reasonably infer that such an amount was for personal use.

"To establish the offense of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), the government was required to establish that [Boyd] knowingly possessed cocaine with the intent to distribute it." United States v. Johnson, 18 F.3d 641, 647 (8th Cir. 1994) (footnotes omitted). It is clear that "[p]roof of actual possession or constructive possession is sufficient to satisfy the element of knowing possession under section 841(a)(1)." Id. We have said that "knowledge of presence, plus control over the thing is constructive possession." Id.

Appellant relies heavily on the case of United States v. Dunlap, 28 F.3d 823 (8th Cir. 1994), where we found that the evidence was insufficient to support a conviction for possession. In Dunlap, the jury found Eric L. Dunlap and Cornelius B. Coleman guilty of possession with the intent to distribute cocaine. The evidence presented at trial was as follows: two police officers executed a search warrant on Dunlap's apartment and found more than 500 grams of cocaine and other items consistent with the distribution of cocaine. At the time the officers entered the apartment, Coleman was standing in the living room approximately eight feet behind Dunlap.

We stated that "[m]ere presence is not sufficient to support a conviction for possession." Id., 28 F.3d at 826. We noted that "constructive possession should not be lightly imputed to one found in another's apartment or home." Id. (internal quotation marks and citations omitted). In determining whether there is sufficient evidence to support a conviction of contraband "found in a place other than appellant's own home," the court considers the following:

> the closeness of the relationship between the appellant and the person whose actual possession is not disputed, the presence of valuable or important personal items belonging to the appellant, such as documents, in the same location as the drugs, and the degree to which the association between the appellant and the actual possessor was related to criminal activity.

Id.

In evaluating the evidence before us in Dunlap, we held that the presence of cocaine and material consistent with distributing cocaine in Dunlap's apartment, without more, was not sufficient to support Coleman's conviction for possession with intent to distribute. Id. See also Johnson, 18 F.3d at 647 (holding that constructive possession is not established where the government fails to establish some nexus between the

defendant and the contraband). We found that Coleman's behavior was more consistent with an intent to purchase cocaine for his own personal use. Dunlap, 28 F.3d at 827.

We once again addressed this issue in United States v. McCracken, 110 F.3d 535 (8th Cir. 1997), a case where we found sufficient evidence of constructive possession to support the defendant's conviction. In that case, the government produced testimony that the defendant lived at the house where the contraband was seized and that the contraband was seized in a bedroom where the defendant had many personal belongings. Id., at 541.

Contrary to Boyd's arguments, we find there is clearly sufficient evidence of constructive possession to support his conviction. There was evidence Boyd was residing at Troupe's residence, Troupe told the marshals that Boyd was upstairs "in his room," Boyd was arrested coming out of the room in which the cocaine was found, Boyd's clothing was found in the room and in the closet in which the cocaine was found, the black bag containing the cocaine had Boyd's social security card and driver's license in it as well as false forms of identification bearing Boyd's picture, and Troupe identified some of the other contents of the bag, such as an electric razor, as items used by Boyd.

With respect to the intent to distribute, we have held that "[a]n intent to distribute contraband may be established with circumstantial evidence," United States v. Ojeda, 23 F.3d 1473, 1476 (8th Cir. 1994), "'including such things, as quantity, purity, and presence of firearms, cash, packaging material, or other distribution paraphernalia,'" United States v. Lopez, 42 F.3d 463, 467 (8th Cir. 1994)(quoting United States v. Peters, 912 F.2d 208, 211 (8th Cir. 1990)). Indeed, an "[i]ntent to distribute may be inferred solely from the possession of large quantities of narcotics." Ojeda, 23 F.3d at 1476 (internal quotation marks and citations omitted). "'The underlying theme of such cases is that defendant possessed a quantity which was more than he would possess for his own use.'" Lopez, 42 F.3d at 467 (quoting United States v. Gay, 774 F.2d 368, 372

–17–

(10th Cir. 1985)). In this regard, Boyd contends that 33.72 grams is a small amount of cocaine and one can reasonably infer that this amount was for personal use.

We agree with the government that when all the circumstances are considered, an intent to distribute may be inferred from the evidence. We believe the following evidence shows that Boyd possessed the cocaine for distribution and sale: a gun was located right next to the black bag, see United States v. Bryson, 110 F.3d 575, 585 (8th Cir. 1997) (holding that evidence of a loaded firearm next to drug related items is probative of intent to distribute); a triple-beam scale and cutting agents were inside the black bag see United States v. Barnes, 140 F.3d 737, 739 (8th Cir. 1998) (holding that possession of a triple-beam scale is evidence of an intent to distribute); and the black bag contained identification forms bearing aliases, see United States v. Walcott, 61 F.3d 635, 638 (8th Cir. 1995) (holding that the use of aliases and other conduct to hide identification is consistent with involvement in the drug trade).

## F. Causing the Filing of a False Currency Transaction Report

Boyd asserts there is absolutely no basis for his conviction of structuring in violation of 31 U.S.C. § 5324. Boyd points out that in this case, the currency transaction reports (CTRs) were filled out, just under an alias. Boyd contends that such conduct cannot constitute structuring as structuring implies splitting a large amount of money to avoid the filing of a CTR.

It is clear, however, that the indictment charged Boyd with causing the Casino Queen to file false CTRs in violation of 31 U.S.C. § 5324(a)(2). To prove a violation of § 5324(a)(2) the government must establish that Boyd caused or attempted to cause the Casino Queen to file a CTR that contained a "material misstatement of fact." 31 U.S.C. § 5324(a)(2). Here, Boyd knowingly presented a false Missouri driver's license under the name Billy M. Jackson to the Casino Queen knowing that the information

–18–

contained thereon would be used to file CTR's. There was sufficient evidence to sustain the conviction.

### G. Joinder/Severance

Boyd next contends the indictment improperly joined offenses that were not of the same or similar character and spanned too large a period of time. He argues that, under no stretch of the imagination, can the firearms and narcotics charges be described as similar in character. Further, he argues the false identification and false reporting transaction charges were not of the same nature and there was no evidence he used the false identifications to further narcotics sales or that he employed them to purchase firearms. Even if the counts were properly joined, he argues the district court erred when it failed to grant his motion to sever.

We review a decision to join counts into a single indictment de novo. United States v. Davis, 103 F.3d 660, 676 (8th Cir. 1996), cert. denied, 520 U.S. 1258 (1997). Under Rule 8 of the Federal Rules of Criminal Procedure, "[t]wo or more offenses may be charged in the same indictment as long as the offenses charged 'are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.'" Davis, 103 F.3d at 676. In applying the "same or similar character" standard, the court permits joinder when "'the two counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each overlaps.'" United States v. Lindsey, 782 F.2d 116, 117 (8th Cir. 1986) (quoting United States v. Shearer, 606 F.2d 819, 820 (8th Cir. 1979)). In Lindsey we found that a 17 month time period did not violate the "relatively short period of time" requirement of Shearer. Lindsey, 782 F.2d at 117.

We have recognized that:

[p]rejudice may result from a possibility that the jury might use evidence of one crime to infer guilt on the other or that the jury might cumulate the evidence to find guilt on all crimes when it would not have found guilt if the crimes were considered separately. On the other hand, a defendant does not suffer any undue prejudice by a joint trial if the evidence is such that one crime would be probative and admissible at the defendant's separate trial of the other crime.

Davis, 103 F.3d at 676.

The government submits that the counts are overlapping because the evidence in each was admissible on the other counts under Rule 404(b). Fed. R. Evid. 404(b). Specifically, it argues: the evidence on each of the gun counts would have been admissible on the other gun count to prove knowledge or lack of mistake; the narcotics found on November 6, 1995, were admissible in the February 1, 1997, case to prove Boyd knowingly possessed the cocaine with the intent to distribute it; the filing of the false CTRs and the use of the Billy Jackson name and other aliases were indicative of drug distribution and to show unexplained wealth; and evidence of gun possession is relevant to proving Boyd knowingly possessed the cocaine with intent to distribute it. Further, it points out the time period from the earliest to the latest offense is less than nineteen months.

We believe the charges were properly joined. With respect to the drug charges and the weapons violations, both times Boyd was found in constructive possession of weapons there were controlled substances in the immediate vicinity of the drugs. It is therefore "reasonable to assume that the firearm[s] could have been used as a vital part of a plan to possess and distribute drugs." United States v. Gorecki, 813 F.2d 40, 42 (3d Cir. 1987)(drugs and weapons connected temporally and logically). In fact, this court has long recognized the existence of a relationship between narcotics dealing and firearms. See also United States v. Milham, 590 F.2d 717, 721 (8th Cir. 1979). While

–20–

we do not hold that narcotics-related and weapons-related charges may always be joined, when the charges are connected temporally or logically they are reasonably joined.

We similarly believe there is a connection between these charges and the remaining charges. We agree that Boyd's maintenance of false forms of identification including Social Security numbers, counts three and four, and his use of a false identity in connection with the filing of the CTRs, counts five, six, and seven, were indicative of drug distribution and showed unexplained wealth. The use of these aliases intertwined and overlapped in each count of the indictment.

Once the counts have been properly joined, the district court may order separate trials of the counts "'[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses.'" Davis, 103 F.3d at 676 (quoting Fed. R. Crim. P. 14). Thus, the question that remains is whether under Rule 14 the district court should have severed the counts. "We reverse a denial of a motion to sever only when the defendant shows an abuse of discretion that resulted in severe prejudice." United States v. Crouch, 46 F.3d 871, 875 (8th Cir. 1995). "Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that [the defendant] would have had in a severed trial." United States v. Koskela, 86 F.3d 122, 126 (8th Cir. 1996).

While Boyd acknowledges the fact that this was a bench tried case decreases the potential for the trier of fact to lose its way amidst the varied evidence necessary to prove violations of the separate statutes, he nevertheless contends he was prejudiced by the denial of the severance motion. First, he states that had the false identification counts been tried separately from the firearm and narcotics charges he may have elected to try one or both sets of charges to a jury and may have chosen to testify in his own behalf. Second, Boyd contends there was substantial evidence on the false currency transaction report counts that would not have been presented in the drug/weapons counts and vice versa.

–21–

After reviewing Boyd's arguments and the evidence, we cannot conclude denial of the severance motion constituted an abuse of discretion. There is nothing in the record to suggest the trial judge could not keep separate the relevant evidence on each count. Further, as was discussed above, much, if not all, of the evidence on each would have been admissible in a separate trial on the other counts under Rule 404(b). As the evidence would have been admissible in a separate trial for another crime under Rule 404(b), a joint trial does not result in additional prejudice. United States v. Brooks, No. 98-1317, 1999 WL 262057, at *5 (8th Cir. May 4, 1999). Boyd simply has not shown that the district court's refusal to sever the counts caused him prejudice.

## H. Prosecutorial Misconduct

Boyd's final contention of error is that the prosecutor engaged in misconduct before and during the trial. Boyd asserts that prior to trial, he had planned to call as witnesses Larry Hassell and Jane Davis. Shortly before trial, however, the prosecutor advised the trial court that due to information he received, he believed Hassell and Davis should be appointed counsel. Once they were appointed counsel, they pled the Fifth Amendment. Boyd asserts that the government's action violated his Sixth Amendment right of compulsory process by converting willing defense witnesses into non-witnesses. He requests reversal of his conviction.

Boyd also asserts that he is entitled to reversal due to intimidation of witnesses by the prosecution. Namely, Boyd contends that after Gerald Boyd, a defense witness, testified he was arrested by marshals in front of persons in the witness waiting room. Boyd states that another defense witness, Devin Wade,[6] was arrested by state or local authorities during the trial. Boyd contends that these arrests had a "chilling" effect on other witnesses.

---

[6]Appellant and the transcript refer to this witness as Devin Wade. The appellee refers to this witness as Kevin Wade.

Boyd suggests the appropriate standard of review is the abuse of discretion standard. See United States v. Riebold, 135 F.3d 1226, 1230 (8th Cir.), cert. denied, 118 S. Ct. 2356 (1998) (holding that abuse of discretion standard is applied when reviewing a district court's decision not to grant a mistrial). There is no evidence in the record, however, that defense counsel asked for a mistrial. Thus, as government submits, the court reviews only for plain error. See e.g., United States v. Green, 151 F. 3d 1111, 1114 (8th Cir. 1998).

We find no plain error. The prosecutor acted properly in bringing to the district court's attention the possible need to appoint attorneys for Hassell and Davis. It is well settled in this circuit that "the Sixth Amendment right of an accused to compulsory process gives way to the Fifth Amendment privilege of a potential witness to be free of self-incrimination." United States v. Velasquez, 141 F.3d 1280, 1282 (8th Cir.), cert. denied, 119 S. Ct. 223 (1998).

With respect to Boyd's allegation that the prosecutor intimidated witnesses, he has made no showing that the prosecutor was involved in any way with the decisions regarding the location or timing of the arrests of either Gerald Boyd or Devin Wade. Similarly, although Boyd alleges the arrests had a chilling effect on defense witnesses, he has pointed to no witness who refused to testify after the arrests or to any testimony he could not elicit because of these arrests.

## III. CONCLUSION

For the reasons stated, we affirm Boyd's conviction.

–23–

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.