# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2977

_____

United States of America,

        Appellee,

v.

Rick D. Cantrell,

        Appellant.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   Western District of Missouri.
\*
\*
\*

_____

Submitted: February 12, 2008
Filed: June 23, 2008

_____

Before LOKEN, Chief Judge, RILEY and SMITH, Circuit Judges.

_____

RILEY, Circuit Judge.

A jury convicted Rick D. Cantrell (Cantrell) of possessing methamphetamine with intent to distribute, conspiracy to manufacture methamphetamine, and possession of a firearm by a convicted felon and unlawful user of a controlled substance. The district court[1] imposed a sentence of 262 months imprisonment. Cantrell appeals his conviction and sentence, arguing the district court erred by (1) denying his two pretrial

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

motions to suppress evidence;[2] (2) refusing to submit Cantrell's requested "mere presence" jury instruction; and (3) determining Cantrell was a career offender under United States Sentencing Guidelines (U.S.S.G.) § 4B1.1, because his 1988 Missouri state court conviction for second-degree burglary constituted a "crime of violence" under U.S.S.G. § 4B1.2. We affirm.

## I.    BACKGROUND

On October 8, 2004, several police officers drove to the Douglas County, Missouri home of Debra James (James) to serve arrest warrants on James and Cantrell. James had an outstanding federal warrant for her arrest, and Cantrell had an outstanding state warrant for his arrest. Officers had information from a confidential informant, who had provided reliable information in the past, that Cantrell was living at the James residence and was currently at the James residence. To access James's rural residence, officers had to cross a tract of land owned by James's father, Charles James. Approximately two years earlier, Charles James had given officers consent to enter onto his land to get to the James house if officers believed something illegal was going on. Charles James's consent was not limited to a specific time period, nor was the permission ever withdrawn. As officers drove down the long driveway leading to the James residence, they observed James in a white Oldsmobile that had been reported stolen. Officers had received information associating both James and Cantrell with the stolen vehicle. The officers asked James to step out of the vehicle, advising James she was under arrest on an outstanding federal warrant.

Deputy Ron Wallace (Deputy Wallace) advised James he also had an outstanding warrant for Cantrell's arrest. Deputy Wallace asked James if Cantrell was inside her home, and James informed the deputy that Cantrell was. Because Deputy

---

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri, adopting the report and recommendations of the Honorable James C. England, United States Magistrate Judge for the Western District of Missouri.

Wallace had heard through various informants that Cantrell might be violent, he asked James if there were any weapons in her home. James advised there were weapons in her home. Deputy Wallace requested and received James's permission to enter the James residence to place Cantrell in custody. When Deputy Wallace and another officer knocked on the door, Cantrell answered. The officers advised Cantrell he was under arrest and took Cantrell into custody without incident.

After arresting Cantrell, officers did a protective sweep of the James residence for their safety to make sure nobody else was in the house. Cantrell told the officers there was a marijuana cigarette in a Marlboro pack on the kitchen table. During the protective sweep, officers observed the marijuana cigarette, as well as a brown glass vial containing a substance that was later determined to be methamphetamine.

During a search of the Oldsmobile, incident to James's arrest, officers found pseudoephedrine pills, cut-off straws, two scales, several Ziploc-type baggies, glass smoking devices with what appeared to be methamphetamine residue, a small bag of marijuana, methamphetamine in both powder and liquid form, a razor blade, and several canisters inside a vinyl bag located on the vehicle's front seat.

Officers then asked James for consent to search her home, informing James they had found drugs and drug paraphernalia in the car and in her home. James consented to a search of her home.

Deputy Wallace never asked Cantrell for permission to search. According to Deputy Wallace, Cantrell never objected to the search. Before the search, Cantrell even asked Deputy Wallace to retrieve his wallet from inside the residence, telling Deputy Wallace the wallet was either on the kitchen counter or in the bedroom in Cantrell's bag of clothes. On the other hand, James testified Cantrell did object to the search, "yelling a lot of obscenities" and "saying you get a search warrant." Cantrell also said, "Everything in that house is mine."

In the kitchen area, officers found a gallon container of denatured alcohol, a gallon container of mineral spirits, and a gallon container of paint thinner. They found a syringe on the dining room table. In a bedroom that contained both men's and women's clothing, officers found a green nylon duffel bag partially protruding from underneath the bed, and a brown rifle case. The green duffel bag contained men's clothing and Cantrell's identification, as well as unused syringes, numerous plastic sealable bags, and several smaller bags. One of the smaller bags contained marijuana, and another contained a syringe filled with a brown liquid, a set of digital scales, and a flashlight. The green duffel bag also contained a salt-like crystal substance; several packs of pseudoephedrine pills; plastic tubing; razor blades; folded tinfoil; two lithium batteries that had been separated from their casing; and a plastic bottle of Vitablend, which is used for diluting methamphetamine. The brown case contained a Marlin .22 caliber rifle and a double-barreled shotgun. In a dresser drawer in the same bedroom, officers found two Hi-Standard .22 caliber pistols and an Iver Johnson .22 caliber Magnum pistol with ammunition. A jewelry box on the dresser contained a plastic bag with a white powder substance that tested positive for methamphetamine. Officers also found an electronic listening device underneath a partially opened window.

At the time of the search, Cantrell told officers everything in the house was his. Cantrell later signed a sworn affidavit in which he took responsibility for all the drugs and drug paraphernalia found in the James home and in the Oldsmobile James was driving when she was arrested. In the affidavit, Cantrell claimed he put the drugs and drug paraphernalia on the James property and in the vehicle without James's permission. Cantrell stipulated at trial that all five firearms had traveled across state lines in interstate commerce, and that on October 8, 2004, he had been convicted of a crime under the laws of the State of Missouri for which the maximum possible term of imprisonment was greater than one year.

On November 17, 2004, Cantrell was charged in a four-count superseding indictment with possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2 (Count I); conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846 (Count II); possession of a firearm in furtherance of a drug offense, in violation of 18 U.S.C. § 924(c) (Count III); and possession of a firearm by a convicted felon and unlawful user of controlled substances, in violation of 18 U.S.C. § 922(g)(1) and (3) and § 924(a)(2) (Count IV). James filed a motion to suppress, which Cantrell joined. After a hearing on the motion, the magistrate recommended James's motion be denied. After the district court adopted the magistrate's report and recommendation and denied James's motion to dismiss, the magistrate issued a second report and recommendation, recommending the motion also be denied with respect to Cantrell. Cantrell then filed a supplemental motion to suppress, arguing James's consent to search her home was invalid because Cantrell had objected to the search. The magistrate recommended Cantrell's supplemental motion be denied as well, and the district court adopted both of the magistrate's reports and recommendations with respect to Cantrell.

On April 10, 2007, a jury found Cantrell guilty of the offenses charged in Counts I, II, and IV of the superseding indictment, and not guilty of the offense charged in Count III. At sentencing, the district court determined Cantrell was a career offender under U.S.S.G. § 4B1.1 because Cantrell's 1988 state court conviction for second-degree burglary constituted a "crime of violence" under U.S.S.G. § 4B1.2. The district court imposed a sentence of 262 months imprisonment under Counts I and II, and a concurrent 120-month sentence under Count IV.

## II.    DISCUSSION

### A.    Motions to Suppress

We review the district court's factual findings underlying its denial of a motion to suppress for clear error and its legal conclusions de novo. See United States v. Wright, 512 F.3d 466, 469 (8th Cir. 2008) (citing United States v. Stevens, 439 F.3d 983, 987 (8th Cir. 2006)). Cantrell argues the district court erred by refusing to suppress the evidence seized during the search of the James home for two reasons (1) the officers entered the James property without a search warrant and without a reasonable belief Cantrell was at the James residence; and (2) James's consent to search her home was invalid because Cantrell was a lawful co-occupant of the home who presented substantial and credible evidence he objected to the search. We address Cantrell's arguments in turn.

### 1.    Initial Entry onto the James Property to Arrest Cantrell

Cantrell contends the evidence seized during the search of the James home should be suppressed because officers entered the James property with a warrant for Cantrell's arrest, but without a search warrant and without a reasonable belief Cantrell resided at or was currently at the James residence. "[P]olice officers do not need a search warrant to enter the home of the subject of an arrest warrant in order to effectuate the arrest." United States v. Powell, 379 F.3d 520, 523 (8th Cir. 2004) (quoting United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999)). "An arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. (citing Steagald v. United States, 451 U.S. 204, 221 (1981)). Officers may enter a third party's home to execute an arrest warrant if the officers "have a *reasonable belief* that the suspect resides at the [third party's home] and have reason to believe that the suspect is present at the time the warrant is executed." Id. (citations omitted). Otherwise, officers cannot "legally search for the subject of an arrest in the home of a third party" without a search warrant, unless exigent circumstances exist

or officers have obtained the third party's consent.  Id. (citing Steagald, 451 U.S. at 215-16).

In Cantrell's case, the warrantless entry into the James home to arrest Cantrell did not violate his Fourth Amendment rights because: (1) officers had a reasonable belief Cantrell resided at the James home and Cantrell was inside the James home at the time the warrant was executed; and (2) officers obtained James's express consent to enter her home and arrest Cantrell.  Officers learned from a confidential informant, who had provided reliable information in the past, that Cantrell resided at and was currently at the James home.[3]  James confirmed the informant's tip, informing officers shortly after her arrest that Cantrell was currently inside her home.  This information was more than sufficient to support the officers' reasonable belief Cantrell resided at the James home and was inside the home at the time officers executed the warrant. Even if officers had no reasonable basis for their belief Cantrell was inside the James home when they served the arrest warrant, James's consent provided an independent basis for officers to enter her home to arrest Cantrell.  James's consent was unequivocal:  Deputy Wallace requested permission to get Cantrell from the James residence to place Cantrell in custody, and James gave her permission. The officers were not required to obtain a search warrant before entering the James home and arresting Cantrell.

---

[3]Cantrell asserts the magistrate and the district court should have discounted the confidential informant's information because Deputy Wallace gave testimony regarding the informant's information that was "not credible, reliable, or consistent." However, "[a] district court's determination as to the credibility of a witness is virtually unreviewable on appeal."  United States v. Heath, 58 F.3d 1271, 1275 (8th Cir. 1995) (citations omitted).  Cantrell provides no basis for concluding the district court clearly erred in crediting Deputy Wallace's testimony that he had reliable information from an informant saying Cantrell was at the James residence.

Upon Cantrell's arrest, a protective sweep like the one officers conducted here is "permissible without a search warrant or probable cause" when the officers' legitimate interest in assuring themselves the house in which the suspect has just been arrested is not harboring anyone who could pose a threat to officer safety "is 'sufficient to outweigh the intrusion such procedures may entail.'" United States v. Cash, 378 F.3d 745, 747 (quoting Maryland v. Buie, 494 U.S. 325, 333-34 (1990)). The level of suspicion required for such a protective sweep is "the same level of suspicion required for a stop and frisk under Terry v. Ohio, 392 U.S. 1 (1968)." Cash, 378 F.3d at 748. Such a protective sweep requires "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" Id. (quoting Buie, 494 U.S. at 334). The circumstances of Cantrell's arrest—particularly James's acknowledgment there were weapons in the house—warranted the officers' protective sweep of the James residence.

Cantrell completely fails to distinguish between the initial entry into the James home to effectuate his arrest; the protective sweep immediately following his arrest; and the subsequent full-scale search of the James home based on James's consent. When officers arrested Cantrell just inside the James residence front door, officers did not search the James home or seize any evidence. During the protective sweep immediately following Cantrell's arrest, officers apparently observed only two contraband items: a marijuana cigarette in a Marlboro pack on the kitchen table, and a brown vial containing a substance later determined to be methamphetamine. It was the subsequent full-scale search, conducted pursuant to James's express consent, that yielded the five firearms and the extensive evidence of methamphetamine manufacturing and distribution which Cantrell seeks to suppress. Cantrell does not argue the consent search was the "poisonous fruit" of the initial entry or the protective sweep, nor does Cantrell argue the initial entry or the protective sweep otherwise operated to invalidate James's consent. As discussed below, Cantrell merely argues

James's consent was invalid because Cantrell was a lawful co-occupant who was present and objected to the search. Thus, even if the initial entry into the James residence or the protective sweep were somehow unlawful, Cantrell provides no basis to suppress the evidence seized in the subsequent consent search.[4]

## 2.    Subsequent Consent Search of the James Home

Cantrell argues the search of the James home, conducted with James's express consent, violated his Fourth Amendment rights. Cantrell does not challenge the voluntary nature of James's consent or her authority over the premises. Instead, Cantrell contends James's consent to search was invalid because Cantrell was a lawful co-occupant of the home, and Cantrell presented substantial and credible evidence he objected to the search. To support his argument, Cantrell relies on Georgia v. Randolph, 547 U.S. 103, 120 (2006), where the Supreme Court held "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." See also United States v. Hudspeth, 518 F.3d 954, 958-61 (8th Cir. 2008) (en banc).

---

[4]In James's motion to suppress, which Cantrell joined, James argued her Fourth Amendment rights were violated when officers allegedly trespassed on her father's, Charles James's, property to effectuate her arrest. Cantrell makes a vague reference to this issue in his brief but does not develop the point with any argument or case citations. To the extent Cantrell raises this issue, we agree with the district court's conclusion no Fourth Amendment violation occurred because officers were clearly operating under a good faith belief they had consent to enter the Charles James property. On at least two separate occasions, Charles James had given officers consent to enter his land any time the officers wanted and to go anywhere the officers wanted to go to thwart any illegal activity. Although Charles James gave this consent approximately two years earlier, there was no testimony Charles James's consent was limited to a particular time period or was ever withdrawn.

In Randolph, the co-occupants were spouses with equal rights to the property. In Cantrell's case, the government contends it is unclear whether Randolph applies because "James, as the owner of the house, had a right to exclude or eject Cantrell at any time, since he was merely an occasional overnight guest." Indeed, the record contains conflicting evidence as to the nature of Cantrell's authority over or interest, if any, in the property. We need not decide whether Cantrell was a "physically present resident" or whether the James residence constituted a "shared dwelling" as contemplated by Randolph because, even assuming Cantrell had a right to object to the search, the district court did not clearly err in finding Cantrell did not object to the search.

James testified Cantrell objected to the search, "yelling a lot of obscenities" and "saying you get a search warrant." In contrast, Deputy Wallace testified he never asked Cantrell for permission to search, and Cantrell never objected to the search. Deputy Wallace further testified that, at one point, Cantrell even asked Deputy Wallace to retrieve his wallet, which Cantrell left either on the kitchen counter or in the bedroom in a bag of clothes. The district court expressly found Deputy Wallace's testimony was credible and James's testimony that Cantrell "spontaneously and loudly disclaimed a grant of consent" was incredible. The district court also noted Cantrell's supposed vehement objection to the search was inconsistent with Cantrell's request that Deputy Wallace retrieve his wallet from the kitchen or bedroom. "A district court's determination as to the credibility of a witness is virtually unreviewable on appeal." Heath, 58 F.3d at 1275 (citations omitted). We find no basis to conclude the district court erred, much less clearly erred.

## B.    Cantrell's Request for a "Mere Presence" Instruction

Cantrell argues the district court erred by refusing to submit his requested "mere presence" jury instruction. We review the rejection of a defendant's proposed "mere presence" jury instruction for an abuse of discretion. See United States v. Jara, 474 F.3d 1018, 1022 (8th Cir. 2007), United States v. Serrano-Lopez, 366 F.3d 628, 637

-10-

(8th Cir. 2004). We will affirm if "the instructions given as a whole . . . fairly and adequately submitted the issues to the jury." United States v. Meads, 479 F.3d 598, 601 (8th Cir. 2007) (quoting United States v. Johnson, 278 F.3d 749, 752 (8th Cir. 2002)). "A [criminal] defendant is entitled to a theory of [the] defense instruction," such as a "mere presence" instruction, if the instruction "is timely requested, supported by the evidence, and correctly states the law." Id. (citing United States v. Claxton, 276 F.3d 420, 423 (8th Cir. 2002)). However, "a defendant is not entitled to a particularly worded instruction where the instructions given by the trial judge adequately and correctly cover the substance of the requested instruction." United States v. Manning, 618 F.2d 45, 48 (8th Cir. 1980) (citations omitted) (per curiam). A "mere presence" instruction is unnecessary where it "would have duplicated the instructions outlining the elements of the offense, the definition of possession, and the burden of proof." Serrano-Lopez, 366 F.3d at 637 (citations omitted).

Cantrell proposed the following instruction:

Mere presence or proximity to a firearm at the scene is not enough to support a finding that defendant knowingly possessed a firearm, unless you find beyond a reasonable doubt that the defendant knew that the firearms were present, and intended to exercise dominion and control over the firearms either directly or through others.

The district court rejected Cantrell's proposed instruction. The district court submitted an instruction which required the jury to find beyond a reasonable doubt Cantrell "knowingly possessed" one or more of the five firearms found during the search of the James residence. The district court also submitted an instruction which defined the term "possession" as follows:

The law recognizes several kinds of possession. A person may have actual possession or constructive possession. A person may have sole or joint possession.

-11-

A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.

A person who, although not in actual possession, has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

Whenever the word "possession" has been used in these instructions it includes actual as well as constructive possession and also sole as well as joint possession.

The parties agree Cantrell's proposed instruction was timely requested and correctly stated the law. The government argues Cantrell's requested instruction was unsupported by the evidence.

We agree there was simply no evidence Cantrell was "merely present" when the guns were found. On the contrary, Cantrell's clothes and his identification were in the bedroom. The house contained methamphetamine and numerous items of methamphetamine paraphernalia, all of which Cantrell stipulated belonged to him. Cantrell told police shortly after he was arrested that everything in the house was his. Cantrell argues this statement referred only to the drug-related evidence in plain view, not to the hidden guns. Even assuming Cantrell's statement was not intended to claim ownership of the guns, the fact Cantrell claimed ownership of the numerous items relating to the manufacture and distribution of methamphetamine strongly refutes the notion Cantrell was "merely present" when police found the guns. Cantrell did not present any witnesses or other evidence to support giving his "mere presence"

-12-

instruction.  Thus, the district court did not abuse its discretion by refusing to submit Cantrell's "mere presence" instruction.[5]

Even if some basis existed for giving a "mere presence" instruction, the district court did not abuse its discretion by rejecting Cantrell's instruction because the jury was correctly instructed on the burden of proof, the definition of "possession," and the requirement that the government prove beyond a reasonable doubt Cantrell "knowingly" possessed a weapon.  These instructions were sufficient to preclude conviction based on Cantrell's "mere presence" at the James home when the police discovered the guns.  As in Serrano-Lopez, a "mere presence" instruction was unnecessary in Cantrell's case because it "would have duplicated the instructions outlining the elements of the offense, the definition of possession, and the burden of proof."  Serrano-Lopez, 366 F.3d at 637 (citations omitted).  We therefore conclude the district court's instructions adequately and correctly covered the substance of Cantrell's requested "mere presence" instruction.

### C.    Cantrell's Second-Degree Burglary Conviction

Cantrell argues the district court erred in determining Cantrell was subject to an increased range of punishment as a career offender under U.S.S.G. § 4B1.1 because Cantrell's 1988 Missouri state court conviction for second-degree burglary constituted a "crime of violence" as defined in U.S.S.G. § 4B1.2.  We review de novo the district court's conclusion a particular offense constitutes a "crime of violence" under the

---

[5]Cantrell's reliance on United States v. Manning is misplaced.  In Manning, the defendant claimed to be an unwitting backseat passenger in a car when the front seat passenger dropped an unregistered gun out the front window.  618 F.2d at 46-47.  We reversed the conviction in Manning for failure to submit a "mere presence" instruction because, unlike in Cantrell's case, the defendant in Manning presented testimony regarding his role in the offense ("merely a backseat passenger") which supported a "mere presence" instruction.  Id. at 46, 48.

"career offender" provision of § 4B1.1.  See United States v. LeGrand, 468 F.3d 1077, 1081 (8th Cir. 2006) (citation omitted).

Under U.S.S.G. § 4B1.2(a), a "crime of violence" is defined, in relevant part, as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . is burglary of a dwelling [or other specified offenses] or otherwise involves conduct that presents a serious potential risk of physical injury to another."  The official "Commitment Report" in Cantrell's burglary case states:

> On or about [the] 14th day of May, 1988, in the County of Wright, State of Missouri, the Defendant violated Section 569.170 RSMo by committing the Class C felony of Burglary second degree punishable upon conviction under Sections 558.011.1(3) and 560.011 RSMo in that the Defendant knowingly entered unlawfully in an inhabitable structure . . . for the purpose of committing stealing therein.

Under Mo. Rev. Stat. § 569.170, "A person commits the crime of burglary in the second degree when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein."  Cantrell's "Commitment Report" does not specify what type of "inhabitable structure" Cantrell entered unlawfully.  Under Mo. Rev. Stat. § 569.010(2):

> **"Inhabitable structure"** includes a ship, trailer, sleeping car, airplane, or other vehicle or structure:
>
> (a) Where any person lives or carries on business or other calling; or
>
> (b) Where people assemble for purposes of business, government, education, religion, entertainment or public transportation; or
>
> (c) Which is used for overnight accommodation of persons.  Any such vehicle or structure is "inhabitable" regardless of whether a person is actually present[.]

Cantrell argues, based on the limited information in the "Commitment Report" and the broad definition of "inhabitable structure" in the Missouri statute, it was impossible for the district court to determine whether Cantrell burglarized a "dwelling" or whether his offense constituted a "burglary" as defined in Taylor v. United States, 495 U.S. 575 (1990). In Taylor, the Supreme Court grappled with how to define "burglary" within the meaning of the Armed Career Criminal Act (ACCA),[6] when convicting states' definitions of "burglary" varied. Id. at 580. The Court reasoned the definition of "burglary" should be uniform, so as to avoid sentencing disparities for identical conduct in different states. Id. at 590-92. Thus, the Court held an offense constitutes "burglary" under the ACCA, regardless of differences in individual states' definitions of "burglary," when the offense contains the basic elements of a "generic burglary," which are "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Id. at 598-99.

It appears Cantrell's offense fits within Taylor's definition of "burglary." In Cantrell's case, however, we need not analyze whether Cantrell's conviction constituted "burglary" as defined in Taylor, because Cantrell's offense was clearly a "crime of violence" under the "otherwise involves conduct that presents a serious potential risk of physical injury to another" clause of § 4B1.2(a).[7] Indeed, Taylor

---

[6]The relevant language in the ACCA is almost identical to the language in U.S.S.G. § 4B1.2(a).

[7]At Cantrell's sentencing, in an effort to show Cantrell burglarized a "dwelling," the government presented Cantrell's deposition testimony from a 2006 civil case, in which Cantrell testified his 1988 conviction was for burglarizing a house that was being built. Cantrell objected, arguing the district court was precluded from considering his deposition testimony under Taylor, 495 U.S. at 602 (explaining the general requirement that sentencing judges "look only to the fact of conviction and the statutory definition of the prior offense," excepting "a narrow range of cases," to determine whether an offense constituted "generic burglary") and Shepard v. United States, 544 U.S. 13, 16 (2005) (further explaining a sentencing court may not examine police reports or complaint applications to determine whether an earlier guilty plea

-15-

made clear "[t]he [g]overnment remains free to argue that any offense—including offenses similar to generic burglary—should count towards enhancement as one that 'otherwise involves conduct that presents a serious potential risk to another[.]'" Id. at 600 n.9.

In concluding Cantrell's second-degree burglary conviction was a "crime of violence," under the "otherwise involves" clause, the district court correctly anticipated the Supreme Court's decision in James v. United States, 550 U.S. __, 127 S. Ct. 1586 (2007), which was decided after Cantrell's sentencing. In James, the Court held attempted burglary, as defined by Florida law, is a "violent felony" under the "otherwise involves" provision of the ACCA. Id. at 1597-98. The Court examined whether the risks posed by attempted burglary were similar to the risks posed by the most closely related enumerated offense—completed burglary. Id. at 1594. In concluding attempted burglary posed a "serious risk of potential physical injury to another," the Court reasoned:

> The main risk of burglary arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party—whether an occupant, a police officer, or a bystander —who comes to investigate. That is, the risk arises not from the completion of the burglary, but from the possibility that an innocent person might appear while the crime is in progress.

Id. at 1595-96.

---

supports a conviction for "generic burglary"). The district court admitted Cantrell's deposition testimony as an exhibit, but stated, "I want to hear the rest of the argument before I'll make a decision as to whether it'll be part of my decision-making here." After hearing arguments, the district court made clear it did not find it necessary to consider the deposition, regardless of the type of "inhabitable structure" Cantrell burglarized or whether his crime constituted "generic burglary" as defined in Taylor, because Cantrell's crime was a "crime of violence" under the "otherwise involves" clause of § 4B1.1.

This reasoning applies with equal force in Cantrell's case. Cantrell unlawfully entered an "inhabitable structure" "for the purpose of committing stealing therein." Missouri law limits the definition of "inhabitable structure" to only those structures where people live, carry on business, assemble, or spend the night. <u>See</u> Mo. Rev. Stat. § 569.010(2). Thus, regardless of whether the "inhabitable structure" Cantrell unlawfully entered was a house, car, boat, airplane, or other "inhabitable structure," there existed the risk of a violent confrontation between Cantrell and the occupant, the police, or another third party. We therefore conclude the district court did not err in determining, regardless of whether Cantrell's state court burglary conviction was a "generic burglary" as defined in <u>Taylor</u>, Cantrell was subject to an increased range of punishment as a career offender under U.S.S.G. § 4B1.1, because Cantrell's state court second-degree burglary conviction constituted a "crime of violence" under the "otherwise involves conduct that presents a serious potential risk of physical injury to another" clause of U.S.S.G. § 4B1.2.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____