# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3995

_____

United States of America

*Plaintiff - Appellee*

v.

Jonathan Russell Wright, also known as Jay-One

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 26, 2013
Filed: January 16, 2014

_____

Before RILEY, Chief Judge, BYE and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury found Jonathan Russell Wright guilty of one count of possessing crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Wright received a sentencing enhancement pursuant to 21 U.S.C. § 851 and was sentenced to life imprisonment. On appeal, Wright challenges (1) the denial of his motion to suppress the evidence seized from his residence; (2) the denial of his motion for a

judgment of acquittal; and (3) the admission into evidence of an out-of-court statement allegedly in violation of his Confrontation Clause right. We affirm the district court's[1] judgment in all respects.

## I. Background

On April 17, 2011, two North Little Rock patrol officers, Richard Gray and Matthew Thomas, responded to a burglar alarm at 2502 Wilshire Drive in North Little Rock, Arkansas, later identified as the residence of Jonathan Wright. The officers heard the alarm as they approached the residence and saw a flat screen television lying on its side in the carport area. The door to the residence, scarred by visible pry marks, was ajar. Immediately after entering the residence, the officers smelled the strong odor of raw marijuana.

The officers then conducted a protective sweep of the residence to ensure no suspects or victims were present. In the northwest bedroom, both officers observed two clear plastic bags containing what appeared to be marijuana in a dresser drawer opened approximately two to four inches. Gray and Thomas finished the room-by-room sweep, determined the residence was clear of all persons, and exited the residence. They reported what they had smelled and observed in the northwest bedroom to their supervisor and to narcotics investigators. Gray then accompanied Lead Narcotics Investigator James Neeley into the residence to show him the suspected marijuana.

Neeley and Investigator Mike Brooks prepared an application for a search warrant based upon their observations and those of the responding officers. Neeley and Brooks presented the warrant application to a state court judge. The judge signed

---

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

the warrant at 3:04 p.m. After the judge signed the warrant but before conducting the search, Neeley ran his narcotics-detecting canine through the residence to pinpoint the location of any controlled substances. To challenge the canine, Neeley closed the dresser drawer containing the previously observed marijuana. The canine alerted to various locations in the residence where narcotics were found, including the now-closed drawer containing the marijuana.

After the canine finished its search of the residence, Neeley instructed other investigators to search the residence, assigning each a room to search. Brooks conducted the search of the northwest bedroom, and Investigator Mike Sexson conducted the search of the southeast bedroom. Brooks also was assigned the task of photographing the evidence. He took photographs of all of the evidence found inside the residence, including evidence found in the southeast bedroom. Brooks took photographs of the residence, of mail addressed to "Mr. Jonathan Wright" at the residence's address, and, ultimately, of the drugs (marijuana and crack cocaine) and cash ($9,300) later found and seized. Because Neeley had already closed the dresser drawer containing the marijuana, no photograph was taken of the marijuana as it was in the drawer when Gray and Thomas initially observed it.

Among other items, the investigators seized the following evidence from the residence: four bags containing a total of 293.2 grams of marijuana, two bags containing a total of 1.4467 grams of crack cocaine, $5,300 found in a jacket pocket, and $4,000 found in a safe, all located in the northwest bedroom; two bags containing a total of 769.66 grams of crack cocaine found in a jacket located in the southeast bedroom closet; a Western Union receipt and other receipts with Wright's name on them; an ADT Security Services bill issued to Wright for monitoring the security alarm; other mail addressed to Wright at the residence's address; and a video surveillance system set up throughout the house.

A federal grand jury returned an indictment charging Wright with one count of knowing and intentional possession with the intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1).

Before trial, Wright filed a motion to suppress the evidence seized during the search of his residence, arguing that exigent circumstances did not exist to justify the warrantless entry into Wright's residence and that the search warrant was not supported by probable cause because the officers did not observe marijuana in plain view in the northwest bedroom. Wright suggested that if Gray, Thomas, and Neeley had observed the marijuana in plain view, they would have photographed the marijuana in the dresser drawer as they initially observed it. At the hearing, Gray and Thomas testified they both smelled a strong odor of raw marijuana when they entered the residence. Gray, Thomas, and Neeley testified that they saw the marijuana in plain view. Wright's counsel questioned them about why they had not taken a photograph of the open drawer with the marijuana in it as they initially saw it. Neeley explained that he had shut the drawer to challenge his narcotics-detecting canine.

Wright's counsel also questioned Neeley regarding an apparent time discrepancy contained in a supplemental report written by Officer Brandon Davidson, another officer at the scene. Davidson's supplemental report stated that he assisted in the search of the residence at 2:25 p.m. The search warrant was not signed until 3:04 p.m. Neeley explained that Davidson did not actually conduct the search but instead remained outside the residence and assisted by keeping a crime scene log. He further explained that the time on Davidson's report probably reflected the time Davidson arrived on the scene. Neeley insisted the officers did not search the house before the search warrant was obtained.

The district court denied Wright's motion to suppress. The court found that probable cause and exigent circumstances justified Thomas's and Gray's entry into Wright's residence and found that the odor of marijuana and the marijuana in plain

-4-

view provided probable cause for the issuance of a search warrant. The court also found that the search did not occur before the officers obtained the search warrant, believing that Davidson recorded the time of his arrival rather than the time the officers conducted the search. The court accepted the testimony of Thomas, Gray, and Neeley as credible.

At trial, the Government provided testimony about the circumstances leading to the search of Wright's residence as well as the evidence seized during the search. Additionally, Mary Beth Clark, an associate broker who manages real estate property including 2502 Wilshire Drive, and Victoria Williams, Wright's sister, testified that Wright had cosigned the lease for 2502 Wilshire Drive, was living at that residence, and made all the rent payments in cash. Investigator Neeley also testified that one gram of crack cocaine has a street value of $100.

During his testimony regarding the photographs he had taken during the search, Brooks was asked why he entered the southeast bedroom, where Sexson had found the 769.66 grams of crack cocaine. Brooks stated that he did not remember specifically what Sexson had said that made him go into the bedroom but that he entered the southeast bedroom because Sexson had called to him excitedly. Wright's counsel then requested to "*voir dire*" Brooks on the issue of whether Sexson was excited. In front of the jury, Wright's counsel asked Brooks if he had heard only a loud noise and not an excited statement. Brooks responded, saying, "It wasn't a loud noise, I mean [Sexson] told me to 'Come here,' something along those lines, 'Come here. We've got something.'" Wright's counsel objected. The district court overruled the objection, finding "[Brooks] hasn't said anything that Mr. Sexson said in order to prove the truth of the matter asserted. He just said 'Come in. Found something.'"

At the close of the Government's case, Wright moved for a judgment of acquittal, which the district court denied. During his case, Wright called one witness,

-5-

Hope Johnson, his girlfriend at the time of the search. Johnson testified that she visited Wright's residence two or three times a week, that a man nicknamed "Boosha" had lived with Wright and so had "Uncle Carl," Wright's uncle, that Wright occupied the northwest bedroom, that "Boosha" occupied the southeast bedroom, and that "Uncle Carl" occupied the northeast bedroom. Johnson further testified that "Boosha" had a key to the residence, knew the security code, and received mail at the residence. Johnson also testified that Wright had kept bunk beds in the southeast bedroom for his children to sleep in when they visited. After the defense rested, Wright's counsel renewed his earlier motion for a judgment of acquittal, which the court again denied.

The jury found Wright guilty, and he was sentenced to life imprisonment. Wright timely appealed, arguing that (1) the district court erred in denying his motion to suppress; (2) the evidence was insufficient for a reasonable jury to infer Wright knowingly possessed and intended to distribute the crack cocaine found in the southeast bedroom; and (3) the admission of Sexson's out-of-court statement violated his Sixth Amendment Confrontation Clause right.

## II. Discussion

### A. Motion to Suppress

On appeal from the denial of a motion to suppress, we review a district court's factual determinations for clear error and its legal conclusions *de novo*. *United States v. Ruiz*, 569 F.3d 355, 356 (8th Cir. 2009).

Wright argues that the district court erred in refusing to suppress the evidence seized from Wright's residence because the court's credibility determinations were clearly erroneous. Specifically, Wright argues that the district court's findings that the officers saw marijuana in plain view and that they did not search the residence

until after the warrant was signed were clearly erroneous. The district court's findings regarding witness credibility "are entitled to particularly great deference," *United States v. Funk*, 985 F.2d 391, 394 (8th Cir. 1993), and are "virtually unreviewable on appeal, *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995). "A district court's decision to credit a witness's testimony . . . can almost never be a clear error unless there is extrinsic evidence that contradicts the witness's story or the story is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it." *Heath*, 58 F.3d at 1275.

At the suppression hearing, Gray and Thomas testified that they smelled a strong odor of what they believed to be raw marijuana immediately upon entering Wright's residence and that they saw two bags of what appeared to be marijuana in an open dresser drawer in the northwest bedroom. Wright claims this testimony was not credible because the officers failed to photograph the marijuana as it sat in plain view. Neeley's testimony, however, provided an explanation for the lack of a photograph. Neeley testified that he saw the marijuana in plain view and that, before the photographs were taken, he closed the dresser drawer to challenge the narcotics-detecting canine to find it. The district court found Gray's, Thomas's, and Neeley's testimony to be credible. We discern no clear error in the district court's finding that the officers did, in fact, see the marijuana in plain view.

Neeley also testified at the hearing regarding the time discrepancy between Davidson's report, which states Davidson assisted in the search of the Wright's residence at 2:25 p.m., and the search warrant, which was not signed until 3:04 p.m. From this, Wright contends the search was conducted before the officers obtained the search warrant. However, Neeley explained that Davidson did not conduct the search but instead assisted by maintaining the crime scene log outside the residence. Neeley insisted the search was not conducted before the search warrant was obtained and stated that the time on Davidson's report likely reflected the time Davidson arrived at Wright's residence. Based on Neeley's testimony, the district court found the time

discrepancy to be the result of Davidson recording the time of his arrival at the scene rather than the time the search began. Again, we discern no clear error in the district court's determination that the search did not occur until after the warrant had been executed.

Accordingly, we affirm the district court's denial of Wright's motion to suppress.

## B. Motion for a Judgment of Acquittal

In reviewing the denial of a motion for a judgment of acquittal, we review the sufficiency of the evidence *de novo*, evaluating the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor. *United States v. Serrano-Lopez*, 366 F.3d 628, 634 (8th Cir. 2004). "This standard is quite strict," *id.*, and the court will not disturb the conviction unless "no reasonable jury could have found the defendant guilty beyond a reasonable doubt," *id.* (quoting *United States v. Frank*, 354 F.3d 910, 916 (8th Cir. 2004)). Importantly, "[i]t is not necessary for the evidence before the jury to rule out every reasonable hypothesis of innocence. It is enough if the entire body of evidence be sufficient to convince the fact-finder beyond a reasonable doubt of the defendant's guilt." *United States v. Surratt*, 172 F.3d 559, 564 (8th Cir. 1999) (quoting *United States v. Noibi*, 780 F.2d 1419, 1422 (8th Cir. 1986)). In order to prove that Wright possessed crack cocaine with the intent to distribute it, violating 21 U.S.C. § 841(a)(1), the Government must prove that he knowingly possessed the crack cocaine with the intent to distribute it. *United States v. Perkins*, 94 F.3d 429, 436 (8th Cir. 2002). Wright contends the Government failed to present sufficient evidence that either he knowingly possessed

the 769.66 grams of crack cocaine found in the southeast bedroom or that he intended to distribute it.[2]

Wright first contends there was insufficient evidence to prove he knowingly possessed the 769.66 grams of crack cocaine found in the southeast bedroom because there was no evidence that he knew about it and because Hope Johnson testified that Wright had two roommates, "Uncle Carl" and "Boosha," and that Boosha slept in the southeast bedroom. Wright's argument fails. Proof of actual or constructive possession of the contraband is sufficient to sustain a conviction under 21 U.S.C. § 841(a)(1). *United States v. Boyd*, 180 F.3d 967, 979 (8th Cir. 1999). Constructive possession is defined as knowledge of presence of the contraband plus control over the contraband. *Id.* Evidence showing a person has "dominion over the premises in which the contraband is concealed" establishes constructive possession. *United States v. Ojeda*, 23 F.3d 1473, 1475 (8th Cir. 1994) (quoting *United States v. Schubel*, 912 F.2d 952, 955 (8th Cir. 1990)). However, when there is joint occupancy of a residence, dominion over the premises by itself is insufficient to establish constructive possession. *United States v. Wajda*, 810 F.2d 754, 762 (8th Cir. 1987) (holding joint occupancy "raises the inference that any one or all of [the occupants] possessed the cocaine [but] [w]ithout more . . . [joint occupancy] would be insufficient to sustain [a] possession conviction[]"); *see also United States v. Mudd*, 685 F.3d 473, 477 (5th Cir. 2012). In joint occupancy cases, there must be some additional nexus linking the defendant to the contraband. *See Wajda*, 810 F.2d at 762.

---

[2]Wright only challenges the sufficiency of the evidence relating to the 769.66 grams of crack cocaine found in the southeast bedroom of his residence and not the 1.4467 grams found in the northwest bedroom, where he slept. Thus, Wright asks the court to remand for entry of judgment and resentencing on simple possession based solely on the 1.4467 grams of crack cocaine found in his bedroom.

Here, a reasonable jury could have concluded that Wright was the sole occupant of the residence, and therefore, his dominion over the premises is sufficient to establish constructive possession. In his brief, Wright concedes that he lived at the residence and that his bedroom was the northwest bedroom. Wright co-signed the lease for the residence with his sister, who offered uncontradicted testimony that she did not live there, and he alone made the rent payments to the leasing agent. The ADT bill for monitoring the security alarm was in Wright's name. A Western Union money-gram and other receipts with Wright's name on them were found during the search of the residence. Moreover, a reasonable jury properly could have discredited Johnson's testimony regarding Uncle Carl and Boosha living at the residence, as she is Wright's ex-girlfriend. *See Surratt*, 172 F.3d at 564. The evidence viewed in the light most favorable to the verdict also does not support Johnson's testimony: Wright's sister did not know that Boosha or Uncle Carl were living at the residence; exercise equipment, rather than a bed, was found in the southeast bedroom at the time of the search; and the mail that was sent to the residence's address and found in the home was addressed only to Wright, not other individuals. Thus, the evidence viewed in the light most favorable to the verdict is sufficient for a jury to infer that Wright was the sole occupant of the residence, had dominion over the premises in which the crack cocaine was found, and, therefore, constructively possessed the crack cocaine found in the southeast bedroom of the home.

Even if the jury were to believe Johnson's testimony that Wright was not the sole occupant of the residence, Wright's argument fails. Constructive possession may be joint and need not be exclusive, *United States v. Brett*, 872 F.2d 1365, 1369 (8th Cir. 1989), and the evidence viewed in the light most favorable to the verdict demonstrates a sufficient nexus linking Wright to the crack cocaine found in the southeast bedroom. Johnson testified that Wright previously kept bunk beds in the southeast bedroom for his children to sleep in when they visited, demonstrating that Wright had access to the southeast bedroom. Additionally, the small amount of crack cocaine found in Wright's bedroom contained the same mixture—cocaine base and

levamisole—as the larger amount of crack cocaine found in the southeast bedroom. The large amount of cash, which is indicative of illegal narcotic sales was found in Wright's bedroom, not the southeast bedroom. *See Wajda*, 810 F.2d at 762. A video surveillance system and an ADT-monitored security alarm were setup throughout the residence; both of which are also indicative of illegal narcotic sales. *Cf. United States v. Schwark*, 719 F.3d 921, 924 (8th Cir. 2013). Thus, the evidence taken in the light most favorable to the verdict, likewise supports the inference that Wright jointly possessed the crack cocaine found in the southeast bedroom. *See Wajda*, 810 F.2d at 762. Therefore, a reasonable jury could have concluded that Wright constructively possessed the crack cocaine found in the southeast bedroom, whether exclusively or jointly.

Wright next argues the evidence was insufficient to prove he intended to distribute the crack cocaine because there was no evidence that Wright bought or sold narcotics nor was there evidence of whether the quantity of crack cocaine seized was a distribution quantity. This argument also fails. "An intent to distribute contraband may be established with circumstantial evidence." *Ojeda*, 23 F.3d at 1476; *see also United States v. Moore*, 212 F.3d 441, 444 (8th Cir. 2000). A large quantity of narcotics alone provides sufficient circumstantial evidence for a jury to infer an intent to distribute it. *Ojeda*, 23 F.3d at 1476 ("Intent to distribute may be inferred solely from the possession of large quantities of narcotics.") (quoting *Schubel*, 912 F.2d at 956); *see also, e.g.*, *Brett*, 872 F.2d at 1369; *United States v. LaGuardia*, 774 F.2d 317, 320 (8th Cir. 1985), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995). Here, Brooks testified that one gram of crack cocaine sells for $100. Thus, the 769.66 grams of crack cocaine, worth approximately $77,000, found in Wright's residence alone is sufficient circumstantial evidence for a jury to infer Wright's intent to distribute. *See, e.g.*, *Brett*, 872 F.2d at 1370 (finding 46.66 grams of crack cocaine to qualify as large or substantial); *United States v. Koua Thao*, 712 F.2d 369, 371 (8th Cir. 1983) (holding a jury reasonably could infer an intent to distribute from 154.74 grams of opium, worth at least $800, even though "evidence

of its value was somewhat vague and contradictory" and even though defendant argued heavy users smoke up to two grams per day).

Other circumstantial evidence of Wright's intent to distribute included $9,300 in cash found in Wright's bedroom, a surveillance system equipped with four cameras and an alarm with a security code, and testimony that Wright made all his rent payments in cash. *See United States v. Boyd*, 180 F.3d, 952 (8th Cir. 2001) (holding a jury could infer an intent to distribute from circumstantial evidence "including such things, as quantity, purity, presence of firearms, cash, packaging material, or other distribution paraphernalia.") (quoting *United States v. Lopez*, 42 F.3d 463, 467 (8th Cir. 1994)); *United States v. Dimarco*, 125 F. App'x 87, 89 (8th Cir. 2005) (holding a large amount of narcotics, counter-surveillance equipment, $10,500 in cash, and packaging material used for distribution supported the jury's verdict that the defendant intended to distribute methamphetamine). Taking all inferences of the evidence in the light most favorable to the verdict, a reasonable jury could have concluded that Wright intended to distribute the crack cocaine found in his residence.

As a result, we affirm the denial of Wright's motion for a judgment of acquittal.

## C. Confrontation Clause

We generally review a district court's evidentiary rulings for abuse of discretion. *United States v. Foreman*, 588 F.3d 1159, 1163 (8th Cir. 2009). However, we review *de novo* Wright's Sixth Amendment Confrontation Clause challenge. *United States v. Holmes*, 620 F.3d 836, 840 (8th Cir. 2010).

Wright argues that the admission of Brook's testimony that he entered the southeast bedroom because Sexson said "something along those lines [of] 'Come here. We've got something'" violated his Sixth Amendment right to confrontation because Sexson did not testify at trial. "The Sixth Amendment's Confrontation

Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (quoting U.S. Const. amend. VI). In *Crawford*, the Supreme Court held that the Confrontation Clause bars the admission of a witness's out-of-court testimonial statements unless the witness is unavailable and the defendant had a prior opportunity to cross examine the witness. *Id.* at 53-54; *Davis v. Washington*, 547 U.S. 813, 821 (2006). *Crawford* made clear that the Confrontation Clause applies only to testimonial hearsay statements. *Holmes*, 620 F.3d at 841. Thus, in order to fall within the purview of the Confrontation Clause, the evidence not only must be testimonial but also must be offered for the truth of the matter asserted. *Id.*; *United States v. Spencer*, 592 F.3d 866, 879 (8th Cir. 2010). If the underlying statement is testimonial but not hearsay, it can be admitted without violating the defendant's Sixth Amendment rights. *Crawford*, 541 U.S. at 59 n.9 ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *Holmes*, 620 F.3d at 841.

Because it is determinative, we turn first to the question of whether Brook's testimony that Sexson said "something along those lines [of] 'Come here. We've got something'" constitutes hearsay—more specifically, whether it was offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). We conclude it was not, and therefore, the admission of Sexson's statement did not violate Wright's Sixth Amendment right to confront witnesses against him. "[A] statement offered to show its effect on the listener is not hearsay." *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013); *see also United States v. Malik*, 345 F.3d 999, 1001 (8th Cir. 2003) ("When the out-of-court statement has relevance when we only consider the effect it had on those who heard . . . it—not whether the statement was true or not, but just its effect on those who heard it—then the statement is not hearsay." (citation and internal quotation marks omitted)); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009); *United States v. Cruz-Diaz*, 550 F.3d 169, 176 (1st Cir. 2008); 30B M.

-13-

Graham, Federal Practice and Procedure § 7034.1 (2d ed.) ("The confrontation clause does not apply to out-of-court statements offered for . . . their effect on listener.").

Brooks's testimony regarding what Sexson said to him was not hearsay because Sexson's statement was offered for its effect on Brooks. The Government asked Brooks why he had gone to the southeast bedroom, where Sexson was assigned to search. Brooks testified that he went there because Sexson had called out excitedly to him but did not remember specifically what Sexson had said. Wright's counsel then asked to "*voir dire*" Brooks on the issue of whether Sexson was excited. During the "*voir dire*," conducted in the presence of the jury, Wright's counsel asked Brooks whether he was responding to only a loud noise rather than an excited statement. It was at this point that Brooks testified, "It wasn't a loud noise, I mean he told me to 'Come here,' something along those lines, 'Come here. We've got something.'"

Here, the Government did not offer Brooks's testimony about Sexson's statement to prove Sexson "got something." In fact, it was Wright's attorney who elicited Brooks's testimony about Sexson's out-of-court statement. Brooks offered Sexson's statement to explain why he went to the southeast bedroom—because he heard a statement, not just a loud noise. Thus, Brooks offered Sexson's statement for its effect on him—that it caused him to enter the southeast bedroom—and not to prove that Sexson "got something." Therefore, the statement is not hearsay. *See United States v. Murphy*, 193 F.3d 1, 5 n.2 (1st Cir. 1999) (explaining that a statement "offered to show the effect of the words spoken on the listener, *e.g.*, to supply a motive for the listener's actions" is not hearsay); *see also Curtis Lumber Co. v. La. Pac. Corp.*, 618 F.3d 762, 783 n.18 (8th Cir. 2010) (finding out-of-court statements offered to show the effect of the statements on the listener were not hearsay); *Cruz-Diaz*, 550 F.3d at 177 (finding the out-of-court confession of a co-defendant did not violate defendant's confrontation clause right because the statement was admitted to explain why the investigation was terminated and not for the truth of the confession);

-14-

*United States v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002) (finding no abuse of discretion where the district court admitted testimony that the witness's boyfriend "told her he had been in jail, that he was a member of the Gangster Disciples street gang, and that he was unable to obtain an [Firearm Owners Identification] card" because it was not hearsay, as it was offered for the effect it had on the listener—to explain why the witness purchased guns for her boyfriend). Because we find Sexson's statement was not hearsay, we need not reach the issue of whether Sexson's statement is testimonial. The admission of Sexson's statement did not violate Wright's Confrontation Clause right. *See Holmes*, 620 F.3d at 841.

## III. Conclusion

For the aforementioned reasons, we affirm.[3]

RILEY, Chief Judge, concurring.

In my view, this case is more difficult than the court's opinion reveals. While I concur in Judge Gruender's opinion for the court and agree with the result, I feel

---

[3]Wright filed a motion to file a *pro se* brief. "[G]enerally we do not consider pro se briefs when a party is represented by counsel." *Wayne v. Benson*, 89 F.3d 530, 535 (8th Cir. 1996). However, we grant his motion and find his *pro se* arguments to be without merit. Wright challenges his sentence on the ground that the district court improperly imposed a mandatory minimum life sentence under 21 U.S.C. §§ 841 and 851 without a jury finding his prior drug conviction beyond a reasonable doubt. Wright relies primarily on *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 570 U.S. ---, 133 S. Ct. 2151 (2013). However, in *United States v. Abrahamson,* we held that the Supreme Court "in *Alleyne* left intact the rule that enhancements based on the fact of a prior conviction are an exception the general rule that facts increasing the prescribed range of penalties must be presented to a jury." --- F.3d ---, No. 11-2404 (8th Cir. Sept. 9, 2013), slip op. at 2.

-15-

compelled to add three observations.

## A.     Fourth Amendment

First, the court's analysis of the suppression issue, though correct as far as it goes, is incomplete.  I agree the district court did not clearly err in finding credible the police officers' account of what transpired in Wright's home on April 17, 2011. See <u>ante</u> at 2-4, 6-8.  My problem is, that account establishes a clear-cut violation of Wright's Fourth Amendment right "to be secure in [his] house[] . . . against unreasonable searches."  U.S. Const. amend. IV.

Officers entered Wright's home without a warrant not once, but twice.  The first time, as the district court concluded, exigent circumstances justified the entry. I agree.  Officers Thomas and Gray were responding to a burglar alarm, and when they arrived at Wright's home there was good reason to think a criminal or victim was inside.  <u>See</u> <u>ante</u> at 2.  They properly and constitutionally entered the home and conducted a protective sweep.  <u>See</u> <u>id.</u>  During that reasonable warrantless search, they smelled and saw marijuana.  <u>See</u> <u>id.</u>  Because the marijuana was in plain view, the officers could have seized it immediately without waiting for a warrant.  <u>See</u>, e.g., <u>Horton v. California</u>, 496 U.S. 128, 135 (1990).  Or, relying on what they had seen and smelled to provide probable cause, the officers could have exited the home and obtained a warrant.  The officers decided to get a warrant. According to Officer Gray, once they finished their protective sweep and "knew nobody was in there, [they] *exited* the house and . . . *secured* the scene so nobody could enter."  (Emphasis added).

The second time police officers entered, there was no justification for the warrantless search.  By the time the narcotics officers reached the scene, Wright's home was "secured," meaning "nobody could enter" or "disturb anything."  Neither exigent circumstances nor public safety any longer justified a warrantless entry, <u>see</u> <u>Mincey v. Arizona</u>, 437 U.S. 385, 392-93 (1978), and the officers—having assured

-16-

themselves no one was inside—could not think there was any risk the marijuana might be destroyed, see Kentucky v. King, 563 U.S. ___, ___, 131 S. Ct. 1849, 1858 (2011). Yet Officer Gray reentered Wright's home, and Investigator Neeley entered for the first time, without a warrant. See ante at 2. Investigator Neeley "[w]alked in, saw there was marijuana," then "said, 'Yes, come *back on out*. We're going to get a search warrant for the house.'" (Emphasis added). This second, warrantless entry was an obvious breach of the "firm line at the entrance to" Wright's "house." Payton v. New York, 445 U.S. 573, 590 (1980); see Mincey, 437 U.S. at 394 ("declin[ing] to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search").

Nonetheless, Wright forfeited his right to relief for this Fourth Amendment violation because his counsel failed to raise the issue in the district court or even on appeal. See, e.g., United States v. Azure, 539 F.3d 904, 912 (8th Cir. 2008). Notwithstanding this failure, our court has discretion to grant relief on plain error review if the violation "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993) (internal quotation omitted); see Fed. R. Crim. P. 52(b). For example, in United States v. James, 353 F.3d 606 (8th Cir. 2003), I joined Judge Richard S. Arnold's opinion reversing a conviction because "[n]ot doing so would . . . condone a *stark violation* of Fourth Amendment rights," id. at 612 (emphasis added). Although the Fourth Amendment violation here cannot be condoned, I conclude a similar exercise of plain error discretion is not justified in this case.

The police ultimately collected the evidence used to convict Wright pursuant to a warrant. When police obtain a warrant based, in part or in whole, on information gleaned through an illegal search, the government may still use the evidence under the independent source doctrine if the government proves "both (1) that the decision to seek the warrant was independent of the unlawful entry—i.e., that police would

-17-

have sought the warrant even if the [unlawful] entry had not occurred—and (2) that the information obtained through the unlawful entry did not affect the magistrate's decision to issue the warrant." United States v. Khabeer, 410 F.3d 477, 483 (8th Cir. 2005). The district court did not consider whether the warrant would have issued despite the violation. Cf. Murray v. United States, 487 U.S. 533, 542 n.3 (1988). Even if Wright had properly raised the issue, our court could do no more than remand for the district court to determine whether the government can meet its burden under Khabeer. Wright's failure to raise the issue forecloses this avenue of relief. See, e.g., Yakus v. United States, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar . . . than that a constitutional right may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.").

## B.    Sixth Amendment

Second, the court's resolution of Wright's Confrontation Clause challenge is not free from doubt. While the court fairly reads the record to say Investigator Sexson's out-of-court statements were not offered to prove the truth of the matter asserted, see ante at 13-15, the court's analysis is legalistic and, I fear, may not sufficiently account for how the jury likely perceived the testimony.

From the jury's perspective, Investigator Sexson's statement appeared to explain not only (1) why Investigator Brooks "had gone to the southeast bedroom," ante at 14, but also (2) when, where, and by whom the most critical piece of evidence in the entire case—the cocaine base for which Wright was on trial—was found. To jurors, Investigator Sexson's statement, which was untested by cross-examination, was an important link in the cocaine base's chain of custody.

The district court could have solved this problem by instructing the jury not to accept Investigator Sexson's utterances as true, but instead the district court compounded the Confrontation Clause problem by admitting most of the affected evidence outside the jury's presence. "[A]ny defect in the chain of custody goes more

-18-

to its weight than its admissibility." United States v. Briley, 319 F.3d 360, 363 (8th Cir. 2003). By admitting this evidence outside the jury's presence, the district court limited the jury's opportunity to consider the effect of Investigator Sexson's absence on the reliability of the chain of custody. When the jury returned, the district court informed the jury that the evidence related to Investigator Sexson was admitted into evidence, placing the court's prestige behind the evidence and shielding the jury from important foundational details affecting the evidence's probative value. It would have been better to introduce the evidence in the jury's presence and instruct the jury that Investigator Sexson's out-of-court statement was not evidence he actually "got something"—let alone the most important evidence in the entire case—in the southeast bedroom.

Despite this concern, I ultimately agree with the court that Wright's Sixth Amendment claim does not merit relief.

## C.    Sufficiency of the Evidence

Third, I agree with the court's rejection of the government's argument that the fact Wright had a key to the home, by itself, proves he *knowingly* possessed the cocaine base found in the southeast bedroom. The government may think prosecutorial discretion is enough to prevent fathers from being imprisoned for marijuana hidden by their sons or to prevent wives from being jailed for their husbands' secret caches of illegal guns or other contraband, but that is not the law. The government's argument rests on a misreading of United States v. Brett, 872 F.2d 1365 (8th Cir. 1989), and is inconsistent with the views of our sister circuits, see, e.g., United States v. Tran, 519 F.3d 98, 105 (2d Cir. 2008), and a long line of our cases stretching back to United States v. Wajda, 810 F.2d 754 (8th Cir. 1987).

The government relies on a footnote in Brett, 872 F.2d at 1369 n.3, "[b]ut no footnote is an island, entire of itself, and [this] statement in [a] footnote . . . must be read in context." Missouri v. Jenkins, 515 U.S. 70, 107 (1995) (O'Connor, J.,

-19-

concurring). In context, the government's reading of <u>Brett</u> is untenable. First, the <u>Brett</u> court relied on the defendant's key only in the context of rejecting a challenge to the government's proof of exclusive dominion and control—not knowledge. <u>See</u> <u>Brett</u>, 872 F.2d at 1368-69. The jury had a strong factual basis from which to infer the defendant's guilty knowledge. As police approached the dwelling to execute their search warrant after completing an undercover purchase of drugs at the dwelling, the defendant fled through the back door and ran. <u>See</u> <u>id.</u> at 1367-68. Police later found him "hiding under a porch" several houses away with thousands of dollars. <u>Id.</u> at 1368-69. Upon arrest, he lied about his identity. <u>See</u> <u>id.</u> Because knowledge was not at issue, the <u>Brett</u> court's reference to "the holder of the key" related only to what *was* at issue: whether the government had proved the defendant's dominion and control over the contraband. "It is to the holdings of our cases, rather than their dicta, that we must attend." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 379 (1994).

Also, we are not free to adopt the government's isolated reading. <u>See</u> <u>Mader v. United States</u>, 654 F.3d 794, 800 (8th Cir. 2011) (en banc). Two years before <u>Brett</u>, we explained in <u>Wajda</u> that our "court has defined constructive possession as *knowledge* of presence *plus* control." <u>Wajda</u>, 810 F.2d at 761 (emphasis added) (internal quotation omitted). "The location of [illegal] drugs in a portion of the house accessible equally to all the occupants raises the inference that any one or all of them possessed cocaine," but "[w]ithout more . . . would be insufficient to sustain their possession convictions." <u>Id.</u> at 762. "[T]here must be some nexus linking the defendant to the drugs." <u>Id.</u>

Following <u>Wajda</u>, we have stated unequivocally that the "[a]bility to control without knowledge of the object's presence is not constructive possession." <u>United States v. Serrano-Lopez</u>, 366 F.3d 628, 634 n.5 (8th Cir. 2004); <u>see</u> <u>also</u>, e.g., <u>United States v. Lee</u>, 356 F.3d 831, 837 (8th Cir. 2003); <u>United States v. Lemon</u>, 239 F.3d

968, 970 (8th Cir. 2001); United States v. Johnson, 18 F.3d 641, 647 (8th Cir. 1994).[4] Thus, in United States v. Pace, 922 F.2d 451 (8th Cir. 1990), our court reversed the conviction of a defendant who held the key because "[t]he evidence d[id] not prove [the defendant] *knew* that he was helping carry cocaine across the country." Id. at 453.

Contrary to the government's contention, the critical question is not whether Wright had a key to the residence. Although certainly relevant, that key alone is insufficient to convict. See, e.g., Gaona-Lopez, 408 F.3d at 505-06 (describing the defendant's possession of the key as just one piece of the evidence pointing to guilt). Even if the jury did not believe Wright shared the home with two other roommates, there is undisputed evidence Wright was not necessarily the only "holder of the key" to the home: Hope Johnson, Wright's then-girlfriend, also had the security code and frequently stayed in the home, including the night before police found the hidden cocaine base. See ante at 5-6, 10. The principal question is whether the government proved Wright *knew* there was cocaine base hidden in the southeast bedroom.

---

[4]On casual reading, some of our court's post-Brett cases might appear inconsistent with Wajda, but a contextual reading of these cases' cursory references to the Brett footnote demonstrate our court has never allowed the government to convict an individual for drugs he knew nothing about based solely upon his possession of a duplicated key. For example, in United States v. Gaona-Lopez, 408 F.3d 500 (8th Cir. 2005), I wrote for the court that the defendant's "possession of the [storage] unit key and the [car] key [was] sufficient evidence to prove knowing possession of the [drugs] concealed inside," id. at 505. But I did not stop there, going on to list a litany of reasons for the jury to disbelieve the defendant's claim that he knew nothing about the illegal drugs. See id. at 505-06. Similarly, while United States v. Timlick, 481 F.3d 1080, 1083 (8th Cir. 2007), quoted Brett for the general proposition that holding the key establishes constructive possession, the opinion only relied on the key to establish dominion or control and then separately addressed, in detail, the evidence establishing the defendant's "knowledge" of the contraband. Id. at 1083-84.

At trial, the government's evidence of such knowledge was not strong. Although police found receipts, mail, and clothes in the northwest bedroom and linked them to Wright, the government made no apparent effort to link the more important clothes found in the southeast bedroom to Wright—even though the cocaine base was hidden inside a jacket. Did the jacket belong to Wright? Did it even fit Wright? The government provided no answer, arguing only that "what was discovered [in] the rest of the house" established Wright's knowledge of the drugs in the southeast bedroom.

What was discovered in the rest of the house certainly provided compelling evidence of possession with intent to distribute marijuana and *personal use* of cocaine base, but as to *distribution* of cocaine base the evidence is more questionable. In Wright's bedroom, police found almost 300 grams of marijuana, less than $10,000, and fewer than two grams of cocaine base. The cocaine base in the southeast bedroom, by contrast, was worth almost eight times as much as the cash found in Wright's bedroom—not particularly consistent with the comparatively small amount of cash attributable to Wright. Given Wright's involvement in marijuana distribution, the elaborate surveillance system[5] similarly does not indicate he knew there was cocaine base in the southeast bedroom. And the absence of evidence showing Wright actually distributed any cocaine base diminishes the strength of the government's case. Cf., e.g., Lee, 356 F.3d at 837.

Despite Wright's reasonable arguments to the contrary, the government offered just enough evidence to sustain the jury's verdict. According to the government's laboratory report, both the large quantity of cocaine in the southeast bedroom and one of the two small quantities of cocaine in Wright's northwest bedroom consisted of a

---

[5]Wright also had a typical home security system. A professionally monitored security system, which will send police to the home if activated—not good news for a drug dealer—is little evidence of guilt.

mixture of cocaine base and levamisole, a veterinary antiparasitic which is highly toxic to human beings.[6] Relying on this report, the jury reasonably could find the hidden cocaine stash was "the same mixture" as Wright's personal cocaine stash, leading to a reasonable, if tenuous, inference Wright knew about the hidden cocaine. Ante at 10.

To be sure, the laboratory report introduced by the government does not detail the proportional composition of the drugs. It is possible that further analysis might have revealed one sample contained a substantially greater proportion of levamisole than the other. In addition, the government's own data reveal the overwhelming majority of cocaine in the United States contains levamisole.[7] Had Wright presented either proportional evidence or testimony about the ubiquity of levamisole in U.S. cocaine, it probably would be impossible for the jury to conclude—reasonably—that Wright's personal cocaine stash contained precisely "the same mixture" as the distribution quantity in the southeast bedroom. But Wright presented no such evidence.

Given the "high hurdle" required to disturb a jury's verdict and our "very strict standard of review," Gaona-Lopez, 408 F.3d at 504 (internal quotation omitted), I join the court in affirming Wright's conviction.

———————————————————

[6]See, e.g., Drug Enforcement Agency, Office of Diversion Control, Levamisole (April 2013), available at http://www.deadiversion.usdoj.gov/ drug_chem_info/levamisole.pdf; Kachiu C. Lee, et al., Complications Associated With Use of Levamisole-Contaminated Cocaine: An Emerging Public Health Challenge, 87 Mayo Clinic Proc. 581 (2012).

[7]See, e.g., Dep't of Justice, Nat'l Drug Intelligence Ctr., National Drug Threat Assessment 2010 4 ("By 2009, approximately 71 percent of the tested cocaine samples contained levamisole.").