# United States Court of Appeals

### For the Eighth Circuit

_____

No. 24-2688

_____

United States of America

*Plaintiff - Appellee*

v.

Shane Mousseaux

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Southern

_____

Submitted: June 11, 2025
Filed: August 18, 2025

_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Shane Mousseaux was charged with several counts of sexual abuse and abusive sexual contact of a minor between the ages of 12 and 16. A jury convicted Mousseaux on all charges. On appeal, Mousseaux asserts the district court erred when it allowed the government to elicit hearsay testimony from the victims and two family members. Although it was a clear abuse of discretion to allow family members to describe repeatedly the children's emotional demeanor and restate

hearsay statements that went far beyond the court's stated nonhearsay purpose, the error was harmless. We affirm.

## I.    BACKGROUND

In April 2015, Mousseaux, an enrolled member of the Rosebud Sioux Tribe, began living on the Yankton Sioux Reservation with his then-girlfriend Desiree and Desiree's three daughters, who we refer to by pseudonyms as Sarah, Jane, and Anne. Mousseaux moved out of the residence in June 2022. Counts 1 through 4 of the superseding indictment allege sexual acts and sexual contact involving Mousseaux and Sarah between August 6, 2020, and June 21, 2022. Count 5 alleges an incident of sexual contact involving Mousseaux and Jane between May 1, 2022, and June 21, 2022.

The case proceeded to trial in April 2024. Sarah testified that Mousseaux engaged in sexual activity with her for the first time when she was 14 years old. She further testified that Mousseaux had sex and engaged in other sexual contact with her multiple times while she was under the age of 16. Sarah testified that the contact took place in different rooms in the home, including her mother's bedroom, in her bedroom, and in the living room. Sarah recalled the incidents happened when her mom was away and sometimes when everyone was asleep in the home.

Sarah also testified about a time when her youngest sister, Anne, came into the living room to ask Sarah to braid her hair. Sarah told the jury that when this happened, Mousseaux was sitting on the couch next to her and leaning toward her. Sarah testified that when Anne appeared, Mousseaux looked out the window behind the couch.

According to Anne's trial testimony, when she went upstairs to ask Sarah to braid her hair, she saw Mousseaux laying on top of Sarah, which scared her. Anne described Sarah as "laying there like she was stiff." When Mousseaux saw Anne, he got off Sarah and moved to another couch in the living room. Anne testified that

Sarah braided her hair and then Anne went downstairs and told Jane about seeing Mousseaux on top of Sarah.

Jane told the jury that when Anne came downstairs, she looked scared. She stated Anne's "eyes were, like, big, and she had tears in her eyes." Anne reported to Jane that Mousseaux "was on top of [Sarah], and then she said that he got up all fast and tried to look out the window, but she said that she saw them kissing."

Jane also testified about an encounter with Mousseaux in May 2022 when she was 14 years old. Jane testified that Mousseaux talked to her about "gross things," including questions about boys touching her, her interest in a threesome, if she was a virgin, and if she ever got wet or knew what that was. At some point, Mousseaux touched her upper inner thigh, and he asked her how it made her feel. Jane testified that she felt uncomfortable and "grossed out." In June 2022, while riding in the car with her aunt, Jane told her aunt about this conversation with Mousseaux, about Mousseaux touching her upper inner thigh, and about what Anne had reported seeing between Mousseaux and Sarah.

On June 17, 2022, Sarah and Jane got into an altercation that resulted in Jane suffering a broken finger. Testimony at trial revealed that during this time family tensions were mounting. Sarah appeared to resent Desiree's parenting style, Jane had become withdrawn, and each girl had begun to express separate concerns to other relatives. Specifically, Sarah told her aunt that Mousseaux behaved in sexually inappropriate ways that made her uncomfortable.

Over Mousseaux's objections, the aunt testified that while she was driving Jane to her home in Bonesteel, South Dakota, Jane began crying and stated, "Auntie, there's something that I have to tell you." Thereafter, Jane related that she was scared, and reported that Mousseaux had touched her upper inner thigh, which made her feel uncomfortable. The aunt informed the jury that based on this information, she decided to convene a meeting with several family members, after which the family decided to call a tribal child protection worker. The next day, Desiree learned

of the allegations and demanded that Mousseaux move out of the house. After hearing Jane's allegations, Sarah told her grandmother that Mousseaux had inappropriate contact with her. Specifically, Sarah told her grandmother that Mousseaux had sex with her, which was later relayed to tribal protection services.

By early July 2022, tribal authorities had referred the case to the Federal Bureau of Investigations ("FBI"), and agents scheduled forensic interviews of all three children. Sarah provided details of sexual contact with Mousseaux from the time she was 14 years old until close to the age of 16. Jane described the conversation with Mousseaux that made her uncomfortable as well as when he touched her upper thigh. Anne recounted during her interview when she saw Mousseaux on top of Sarah on the couch. Mousseaux later told the FBI he merely "got close to [Sarah's] face to look at her braces."

At trial, Mousseaux asserted that the children fabricated the allegations due to friction with their mother and a desire to move out of her home. This claim was explored at length during the trial—with defense counsel inquiring whether Sarah and Jane harbored resentment toward Desiree and whether the allegations against Mousseaux were an artifice designed to allow them to leave their mother's home. Through cross-examination and in closing arguments, defense counsel emphasized that about seven months before the reported abuse, Sarah and Jane ran away from Desiree's house after a heated fight with their mother and stayed with relatives during a child protective services investigation that focused on Desiree's conduct rather than any conduct involving Mousseaux. Mousseaux pointed out that despite having an opportunity to raise concerns about sexual abuse at that time, the girls never accused or even mentioned improper acts by Mousseaux.

The jury found Mousseaux guilty on all counts. As to the conduct involving Sarah, the district court imposed concurrent 120-month terms on the sexual abuse counts and a concurrent term of 24 months for abusive sexual contact. As to the conduct involving Jane, the court imposed a consecutive 15-month term, for a total imprisonment term of 135 months to be followed by 5 years of supervised release.

Mousseaux seeks a new trial on the grounds that the district court committed a clear abuse of discretion when it allowed inadmissible hearsay evidence and because the court's limiting instructions were ineffective to avoid improper bolstering of the children's credibility, these evidentiary errors were not harmless.

## II.    DISCUSSION

Mousseaux challenges the district court's admission of three groups of out-of-court statements: (1) Anne's statement to Jane that Anne had seen Mousseaux kissing Sarah; (2) Jane's subsequent statement to her aunt repeating Anne's kissing claim and her more detailed statements related to Mousseaux's sexual remarks and touching; and (3) Sarah's statement to her grandmother that Mousseaux had engaged in sexual acts and sexual contact with her. According to Mousseaux, because each statement was hearsay admitted for its truth and the effect was to bolster the children's credibility, the errors were not harmless and he is entitled to a new trial.

We review the admission of alleged hearsay testimony for a "clear and prejudicial abuse of discretion." United States v. Norman, 107 F.4th 805, 810 (8th Cir. 2024). Any "error in admitting hearsay evidence is harmless if the error did not influence or had only a very slight influence on the verdict." United States v. Lasley, 917 F.3d 661, 665 (8th Cir. 2019) (per curiam) (cleaned up).

### A.    Jane's Testimony Recounting What Anne Told Her

Mousseaux contends the district court clearly abused its discretion when it admitted Jane's testimony that Anne told her that she saw Mousseaux kissing Sarah because it is hearsay and does not fall into an exception. Federal Rule of Evidence 803(2) allows for the admission of an out-of-court "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." The rationale for excepting excited utterances from the general rule against hearsay is due to experience that teaches statements made while under the stress or shock of an event retain "a guarantee of trustworthiness that is

-5-

not present when the declarant has the opportunity for reflection and deliberation." United States v. Graves, 756 F.3d 602, 604–05 (8th Cir. 2014) (cleaned up). Whether the declarant was still excited, or had "the opportunity for reflection," is a factual determination within the district court's sound discretion. Id.

Here, the district court found the statements Anne made after she came down the stairs "wide-eyed" and "teary-eyed" were admissible as excited utterances. The defense vigorously cross-examined the statements, including that Anne never testified to the kissing. After careful review of the record, we conclude the district court committed no abuse of discretion, clear or otherwise, when it found Anne's statements were made under the stress of a startling event. See id. at 605–06 (determining the child's state of distress demonstrated by shaking and the appearance of crying shortly before she made the statements in response to a general inquiry about what had happened was sufficient to support application of the excited utterance exception). Even though Anne did not testify at trial about the detail that she saw Mousseaux and Sarah "kissing," this is the sort of inconsistency that goes to weight rather than admissibility. See United States v. Byrne, 83 F.3d 984, 990 (8th Cir. 1996).

Mousseaux also claims the district court abused its discretion when it failed to give the jury a limiting instruction. Excited utterances are nonhearsay and do not ordinarily require a limiting instruction. See United States v. Moses, 15 F.3d 774, 777 (8th Cir. 1994) ("[T]he statement could have been admitted for the truth of the matter asserted because it falls within the excited utterance exception."). The district court did not abuse its discretion in admitting Anne's out-of-court statements to Jane under the excited utterance exception nor by not giving the jury a limiting instruction.

B.      *The Aunt's and Grandmother's Out-of-Court Statements*

Mousseaux next challenges three statements admitted by the district court during the aunt's and grandmother's testimony. Those statements include: (1) Jane's

statements to her aunt relaying Anne's allegations; (2) Jane's disclosure to her aunt about Mousseaux touching her and conversation with her that made her uncomfortable; and (3) Sarah's partial disclosure to her grandmother about sexual acts with Mousseaux.

The district court received each of the statements for a limited purpose and gave a limiting instruction before admitting the statements. In the limiting instructions, the court told the jury that the statements were not offered for their truth, but rather for the limited purpose of explaining "what this witness did with the information that she received and how this led to an investigation." At one point when the aunt was testifying, the court interjected, stating the answer had become a narrative and directing the prosecutor to ask another question. Similarly, before the grandmother began testifying about what Sarah had reported to her, the district court gave the same limiting instruction and added that the testimony, if inconsistent with Sarah's testimony, could be used to assess credibility.

An out-of-court statement offered strictly to show its effect on the listener or to explain subsequent actions by the listener is nonhearsay. United States v. Wright, 739 F.3d 1160, 1170–71 (8th Cir. 2014). This Court has noted that a statement is not hearsay if it is admitted to explain the origin of an investigation, such as how and when a witness learned about an incident and the steps the witness took in response. United States v. Mackey, 83 F.4th 672, 675 (8th Cir. 2023). Details that go beyond explaining the origins of the investigation, such as details about the incident itself, the emotions displayed, or a person's demeanor, are generally improper. Id. at 675–76. When additional testimony that goes beyond explaining the origins of an investigation is introduced, it becomes problematic, particularly if the testimony serves to bolster the alleged victim's credibility and help rebut an allegation of fabrication. Id. at 676. The harmful risk is allowing a witness to essentially recite the substance of the out-of-court accusation as "background" information, which tends to cross the line and begin to function as substantive proof or bolstering testimony. See United States v. Bercier, 506 F.3d 625, 632 (8th Cir.

2007) (finding error where a witness's extended recitation of the victim's statements described the entire sexual assault).

### 1. The Aunt's Testimony About Jane's Statements

The disputed evidence was introduced when the aunt testified about Jane relaying to her that Anne saw Mousseaux kissing Sarah. The aunt also described Jane's reporting to her about sexual questions Mousseaux had asked Jane, that Mousseaux touched Jane's inner thigh, and that Mousseaux made Jane feel afraid.

When limited carefully, statements providing context for other admissible statements may be permissible. See United States v. Ralston, 973 F.3d 896, 913 (8th Cir. 2020). Here, however, the aunt's recitation went beyond explaining why she decided to involve other family members or call child protective services.

> Q: [Aunt], can you tell us what [Jane] told you in the car that day in June of 2022.
>
> A: She started crying right away, and she told me that -- she said, "Auntie, there's something that I have to tell you." And she was crying, so it made me worried. So I said, "What, [Jane]. Just tell me." I said, "I won't say nothing if you don't want me to." And she said, "I'm scared." And so I said, "Just tell me." It got me worried at that point. And she said, "Boo" -- they called [Anne] Boo-boo, and then the girls call her Boo even at that. So she said, "Boo seen Shane kissing [Sarah] -- Boo caught Shane kissing [Sarah] on the couch." And she was crying. And -- yeah. It led into her saying more, more stuff. She just, like, started blurting everything out. She was crying. I didn't cry at the time. I was just listening to her. Yeah.
>
> Q: What else did [Jane] tell you about maybe her interactions with [Mousseaux]?
>
> COURT: The same instruction applies. You can't consider it for the truth of the matter asserted but rather for why this witness did what she did. Go ahead.

A: She started telling me about the conversation that her and Shane had, and it was just, like, a couple days before, because Shane wasn't in the area, but it was just a couple days before he left the area. And she said that "And, Auntie, he had a conversation with me, like a sex talk. And he was asking me all kinds of stuff that I didn't -- I shouldn't even know." And she was, like, trying to cry, and I was listening to her.

And then she said just -- she said, like -- asked her about masturbation, asked her if she gets wet down there, if she shaves down there in her private area, asked her if she has a boyfriend or if she ever kissed a boy. And then as time went on, he -- because the way their couch was shaped is like an L, kind of. And he was sitting at the end. And she said as he was talking, he kept getting closer to her. He kept sliding closer, and then pretty soon he was sitting by her.

And then he said, "Well, does this make you uncomfortable?" and he touched her leg, her right leg as he was sitting there. "Does this make you uncomfortable?" And I can't remember if she said yes or no or what, but I know she said she was scared. She felt uncomfortable. And then it went into stand up -- there was a lot said. I can't even really remember everything but private stuff.

COURT: It's gotten kind of narrative, so go ahead with our next question.

Q: I do have one follow-up question. When you mentioned that [Jane] had said he touched her on her leg, you kind of made a gesture when you did that. Can you describe --

DEFENSE COUNSEL: Objection, Your Honor.

THE COURT: Overruled.

Q: Can you describe where you just gestured to when you were talking about --

A: Her right upper thigh.

This detailed, emotional retelling of Jane's entire disclosure strayed far beyond what was necessary to explain the aunt's actions after learning of the allegations. See Bercier, 506 F.3d at 632 (holding that the only effect of a physician's recitation of the victim's entire sexual assault disclosure was to bolster the alleged victim's trial testimony).

It is plain from a review of the record, including the court's rulings, that the court intended the aunt's testimony to be limited to explaining why the aunt convened a family meeting and why the family called a tribal child protection worker. When defense counsel failed to object when the testimony devolved far beyond the court's anticipated nonhearsay purpose of explaining why the action was taken, and the government failed to control its witness in line with the court's rulings, the district court was placed in a difficult position—either interject and risk drawing more attention to the evidence or remain silent and allow the evidence in with all its attendant harm. While we recognize the problematic position counsel put the district court in, allowing the aunt to entirely restate Jane's hearsay statements and describe Jane's emotional demeanor went far enough beyond the court's stated nonhearsay purpose to constitute a clear abuse of the court's discretion. See id. (noting a district court abuses its discretion when it permits hearsay testimony that does not fall within a Rule 803 exception).

### 2. The Grandmother's Testimony About Sarah's Statements

The grandmother's testimony has the same overreach as the aunt's testimony. As with the aunt's testimony, the district court instructed the jury that Sarah's statement was being received not for its truth, but for the jurors to assess credibility and "to understand what this witness did with the information and how this led to an investigation." The grandmother not only recounted Sarah's disclosure that Mousseaux had sex with her, but she offered details about Sarah's emotional state, both before and after the disclosure. Sarah's grandmother testified:

Q: How was [Sarah] behaving during that second family meeting, if you remember?

A: She was pretty well. She was quiet. She was crying. And at two times there she ran off hysterically crying.

\* \* \*

Q: And did she tell you about something that had happened to her?

A: Yes.

Q: What did she say to you?

DEFENSE COUNSEL: Objection. Hearsay.

GOVERNMENT COUNSEL: Not offered for the truth, Your Honor.

THE COURT: All right. Again, you cannot take this testimony for the truth of the matter asserted but rather to understand what this witness did with the information and how this led to an investigation. It can also be taken to -- if it's inconsistent with [Sarah]'s testimony, can be taken on her credibility. So go ahead.

GOVERNMENT COUNSEL: Thank you, Your Honor.

Q: So, [grandmother], when you and [Sarah] were in the house together, what did she say to you about what happened between her and Shane?

A: She -- when I came out of the restroom, she was sitting there, and I -- I was standing by her, because she was crying, and she had said -- she calls me Mom also. So she said, "Mom, I have to tell you something." So I said, "Okay." And I sat down beside her, and I was hugging her. And she looked at me, and she said, "Mom, he had sex with me."

-11-

Q: So, [grandmother], based on that information, what did you do?

A: I hugged her, and I -- she was -- she started crying, and so I was consoling her, you know, told her everything was going to be okay and that we were going to, you know, take care -- everything was going to be okay.

Q: And based in part on what [Sarah] told and you what [Jane] had also told, did the family report this?

A: Yes.

Allowing the grandmother to testify that Sarah disclosed sexual contact, which led her to take actions fell within the court's ruling and is consistent with our precedent, but the additional details offered by the grandmother impermissibly go to the core of the charged offenses and created a genuine risk of improper witness bolstering. While some level of detail is unavoidable to explain why subsequent actions were taken, the extensive secondhand recounting of Sarah's emotional state and the grandmother's responses went well beyond the court's ruling and is inconsistent with this Court's precedent. See Bercier, 506 F.3d at 632–33. As with the aunt's testimony, when the grandmother's testimony went far afield, neither the government nor defense counsel interjected or attempted to control the testimony. Once again, the court was left with a conundrum as to how to moderate the improper evidence without drawing more attention to it. But, because it is the district court's duty to keep improper testimony from the ears of the jury, the failure to limit the evidence when it went beyond explaining the origin for the investigation was a clear abuse of discretion on the part of the district court. See id.

C.    *Relief Warranted for Evidentiary Errors*

The improper admission of hearsay testimony does not warrant reversal unless it affected the defendant's substantial rights or substantially influenced the verdict. See Fed. R. Crim. P. 52(a); Lasley, 917 F.3d at 665.

-12-

Here, the district court specifically and repeatedly instructed the jurors to limit their consideration of the aunt's and the grandmother's testimony. The court instructed the jury that the testimony may be considered only to explain why and how the family reacted to the reports of Mousseaux's improper conduct. Jurors are presumed to follow the court's instructions, United States v. Thomas, 877 F.3d 1077, 1079 (8th Cir. 2017), and the limiting instructions given by the district court in this case lessened the risk that the jury accepted the out-of-court statements as conclusive proof of Mousseaux's guilt. See United States v. Bettelyoun, 892 F.2d 744, 746 (8th Cir. 1989).

More importantly, Sarah, Jane, and Anne each testified and were subject to vigorous cross-examination. Their testimony rendered the adult relatives' retellings cumulative. "The admission of hearsay evidence that is cumulative of earlier trial testimony by the declarant or cumulative of other hearsay evidence to which no objection was made is not likely to influence the jury and is therefore harmless error." United States v. Sully, 114 F.4th 677, 686 (8th Cir. 2024) (citation omitted); see Mackey, 83 F.4th at 676 (finding no prejudice where improper hearsay testimony repeated what the victims told the jury). As is typical in cases of this nature, the credibility of the victims was the focal point at trial. The jurors had the opportunity to hear the children's testimony, resolve inconsistencies, and assess credibility. The secondhand accounts from the children's aunt and grandmother were cumulative of other testimony and their admission was harmless. See United States v. DeMarce, 564 F.3d 989, 997–98 (8th Cir. 2009) (concluding the admission of statements that served to bolster a witness's credibility by repeating testimony already in the record constituted harmless error); see also Bettelyoun, 892 F.2d at 746 (determining the admission of hearsay testimony that the jury was already aware of was harmless).

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____