# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-2575

_____

United States of America

*Plaintiff - Appellee*

v.

Marcus McIntosh

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: March 8, 2017
Filed: June 20, 2017

_____

Before RILEY,[1] Chief Judge, GRUENDER, Circuit Judge, and GRITZNER,[2]
District Judge.

_____

RILEY, Chief Judge.

_____

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United
States Court of Appeals for the Eighth Circuit at the close of business on March 10,
2017.  He has been succeeded by the Honorable Lavenski R. Smith.

[2]The Honorable James E. Gritzner, United States District Judge for the
Southern District of Iowa, sitting by designation.

In April 2014, police officers began investigating Marcus McIntosh to determine whether he was involved in a conspiracy to traffic crack cocaine. The investigation culminated when officers obtained a warrant and searched a home McIntosh owned (but did not permanently reside in), where they found drugs, marked money, and several firearms. McIntosh was indicted on several drug and gun related counts. The case went to trial, and the jury found McIntosh guilty of five of the six charges filed against him, including one for being a felon in possession of a firearm. See 18 U.S.C. § 922(g)(1). The district court[3] sentenced McIntosh to 180 months in prison on each count, to be served concurrently. See id. § 924(e)(1) (statutory minimum). McIntosh raises only one issue on appeal: whether the government presented sufficient evidence to establish he knowingly possessed a firearm.[4] We conclude there was sufficient evidence, and therefore affirm. See 28 U.S.C. § 1291 (appellate jurisdiction).

McIntosh moved for a judgment of acquittal after the government finished presenting its evidence at trial.[5] See Fed. R. Crim. P. 29(a) ("[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."). The district court denied the motion, and the jury found McIntosh did indeed possess a gun. "We review the denial of a motion for judgment of acquittal *de novo*, viewing the evidence and all reasonable inferences in the light most favorable to the jury's verdict." United States

---

[3]The Honorable Stephen R. Bough, United States District Judge for the Western District of Missouri.

[4]To establish a violation of § 922(g)(1), the government needed to prove beyond a reasonable doubt McIntosh (1) was a felon, (2) knowingly possessed a firearm, and (3) that firearm had been in or affected interstate commerce. See United States v. Ellis, 817 F.3d 570, 576 (8th Cir. 2016). The parties stipulated to the first and third elements.

[5]McIntosh did not present any evidence in his defense.

v. McDonald, 826 F.3d 1066, 1072 (8th Cir. 2016) (per curiam). Thus McIntosh can prevail only if no reasonable jury could have found he knowingly possessed a firearm beyond a reasonable doubt. See id. With that perspective in mind, we recount the evidence offered at trial.

## I.     THE EVIDENCE

When the Kansas City Police Department (Missouri) learned about McIntosh's potential drug-dealing activities in spring 2014, Detective Don Stanze spearheaded an investigation into McIntosh and his two suspected accomplices, brothers Tyrone and Tyronn Campbell. Detective Stanze worked with two confidential informants and several undercover detectives to organize and execute a string of controlled buys over the months that followed. Of relevance here are four controlled buys occurring at 3910 Flora Avenue, a single-story house McIntosh owned. Though McIntosh maintained another residence and did not live at 3910 Flora, his then-girlfriend, Sherita Hardison, did live at the Flora house. It is unclear how often McIntosh stayed the night, however, Hardison testified McIntosh "was there almost every day."

The last controlled buy occurred on August 8, 2014, when a confidential informant used marked money to purchase crack cocaine from McIntosh at 3910 Flora. Not long after the deal was complete, officers served a knock and announce warrant, and the tactical team found McIntosh in the living room and arrested him. Hardison was also arrested. At trial, the government presented a considerable amount of evidence seized during the search. Most relevant for our purposes are the three guns found in the bedroom where Hardison (and, on occasion, McIntosh) slept: there was a .22-caliber Ruger semiautomatic pistol sitting in plain view on top of a nightstand, next to a piece of mail addressed to McIntosh and a small amount of crack cocaine; a 9mm PW Arms pistol hidden between the mattresses; and a 12-gauge shotgun resting against an entertainment center. Officers also found items indicative of drug dealing elsewhere in the house—digital scales, ingredients and equipment

used to make crack cocaine, and a safe containing crack cocaine and most of the marked money from that day's deal.

Detective Stanze interviewed both McIntosh and Hardison at the police station shortly after the search concluded, and the officer testified about these interrogations at trial. McIntosh and Hardison each claimed the guns belonged to a man named Curly Pouncil, who had brought the guns to 3910 Flora about a month and a half earlier while he was renting a room in the basement. Most notably, Detective Stanze said McIntosh "admitted . . . that he knew the guns were there, that he had handled the firearms, had moved the firearms from place to place, and on a couple of occasions had actually taken one of the firearms to investigate a disturbance . . . that was going on outside of his residence." This conflicted with what Hardison—who admittedly was "very" high on crack cocaine during the post-arrest interview—first told Detective Stanze, when she claimed McIntosh never handled the weapons. Hardison changed her story at trial, testifying that although McIntosh did not carry a gun around on a day to day basis, he handled the weapons when he needed them for their "protection" and would "sit at the table with [a gun] when he was cutting up" drugs.

## II.    DISCUSSION

McIntosh attacks the adequacy of this evidence in several ways. He first takes aim at the government's evidence suggesting he had *constructive* possession of the guns. See United States v. Battle, 774 F.3d 504, 511 (8th Cir. 2014) ("The government can prove knowing possession by showing actual or constructive possession, and possession can be sole or joint. Constructive possession is established if the person has dominion over the premises where the firearm is located, or control, ownership, or dominion over the firearm itself." (citation and internal quotation marks omitted)). McIntosh emphasizes he did not permanently reside at 3910 Flora with Hardison, yet this fact does not negate the possibility of constructive possession. For instance, in United States v. Butler we upheld a jury verdict where

the gun was found between the mattress and box springs in a home owned by the defendant's girlfriend, even though the defendant "maintained a separate apartment." United States v. Butler, 594 F.3d 955, 964 (8th Cir. 2010). The evidence showed the defendant had been staying with his girlfriend "for some period of time," appeared to use the house for drug trafficking, and was present when the search occurred. Id. at 964-65. The gun was hidden in the south part of the bed, which was the same side of the room that officers found the defendant's wallet and a few other personal effects. See id. The Butler facts are not so different than the facts here. Yes, McIntosh maintained a different residence. But there is evidence to indicate McIntosh was at 3910 Flora—a house he owned, unlike the defendant in Butler—"almost every day," used the residence to store and sell drugs, and was present during the search. One of the guns was found right by a piece of mail addressed to McIntosh at 3910 Flora. This is all circumstantial evidence McIntosh had constructive possession of the guns. See id. at 965 ("Constructive possession of a firearm . . . may be established with circumstantial evidence.").

McIntosh also attempts to marginalize the evidence that suggests he ever exercised *actual* possession over the guns. The bulk of McIntosh's argument on this point is spent attacking Hardison's credibility. McIntosh's arsenal for this attack is well-stocked. Hardison admitted she changed her story somewhere between the first interrogation and the trial (though Hardison was "very" high on crack at the first interview). Hardison acknowledged the government encouraged her to cooperate and she had not yet been charged for her own involvement. In addition, not only was Hardison no longer romantically involved with McIntosh, she was now pitted against him (and his new girlfriend) in a civil suit in which McIntosh sought to evict her from 3910 Flora and she counterclaimed for "lies being told against" her. Given these concerns, we agree a jury would have had ample reason to discredit Hardison. "But weighing the evidence and assessing the credibility of witnesses are 'exclusively for the jury.'" United States v. Ellis, 817 F.3d 570, 577 (8th Cir. 2016) (quoting United States v. Kirk, 528 F.3d 1102, 1111 (8th Cir. 2008)). McIntosh raised these

credibility issues at trial, and they "were for the jury—not the court—to resolve." Id.; accord Butler, 594 F.3d at 964 ("We do not weigh the evidence or assess the credibility of witnesses.").

While Hardison's testimony supports the verdict,[6] so does the admission McIntosh made to Detective Stanze. McIntosh also complains the video recording of his interrogation was never played for the jury, yet McIntosh never objected nor did he offer the recording himself. We see nothing wrong with submitting McIntosh's statement through Detective Stanze's testimony. See also, e.g., United States v. Boyd, 180 F.3d 967, 978-79 (8th Cir. 1999) (determining there was sufficient evidence where an officer testified about how the defendant, after he was arrested, admitted the gun was his).

McIntosh's other arguments are similarly unpersuasive. To the extent McIntosh argues the guns belonged to Pouncil, ownership and possession are distinct concepts and the absence of one does not preclude the possibility of the other. See United States v. Boykin, 986 F.2d 270, 274 (8th Cir. 1993) ("[O]wnership is irrelevant to the issue of possession."). McIntosh also points to the lack of forensic evidence linking him to any of the firearms, and emphasizes "[n]o law enforcement witness ever testified to seeing [him] with any firearm, despite the fact that they had

---

[6]McIntosh posits the jury must have disbelieved Hardison's testimony because if, as Hardison claimed, McIntosh handled the guns while he was cutting drugs, then how could the jury not find him guilty of possessing a gun in furtherance of drug-trafficking crimes? "'We have previously held, when considering what are characterized as inconsistent verdicts, that we only ask whether the government presented sufficient evidence to support the conviction.' This is because '[w]e are reluctant to delve into the minds of the jurors to determine the reasons for apparently inconsistent verdicts.'" McDonald, 826 F.3d at 1073 (alteration in original) (quoting United States v. Opare-Addo, 486 F.3d 414, 416 (8th Cir. 2007)). We also note there was ample other evidence of McIntosh's firearm possession for the jury to rely upon without Hardison's testimony.

conducted significant surveillance of him." Forensic evidence and officer observations are ways for the government to present sufficient evidence of knowing possession—such evidence is not required. See, e.g., Butler, 594 F.3d at 965 (identifying sufficient evidence even though "there was no forensic evidence presented to link Defendant to the handgun and no witness testified to seeing Defendant with the handgun"); see also United States v. Varner, 678 F.3d 653, 657 (8th Cir. 2012) ("[F]orensic evidence is not necessary for a conviction."). Circumstantial evidence of constructive possession and testimony about prior specific instances where the defendant handled the firearms are also methods for the government to meet its burden. The government offered these latter forms of evidence at trial. The jury found such evidence sufficient to prove guilt beyond a reasonable doubt. We conclude this was a reasonable conclusion.

## III.   CONCLUSION

We affirm.

_____